

Mario Zanghi  96A5881
Five Points Correctional Facility
State Re. 96, Box 119
Romulus, N.Y.  14541                    *99- CV - 6293CJS*

APR 1 4 2005

April 13, 2005

Hon. Charles J. Siragusa
United States District Court
U.S. District Courthouse
100 State Street
Rochester, N.Y.  14614-1363

Dear Judge Siragusa:

        I am writing pertaining to a few issues that I believe are necessary in your reviewing of
my petition.  I bring these to your attention in the hope of showing just how undermining my
arrest and trial and in-between procedures where done by the homicide detectives, the DA and
the lawyer who was supposed to have my best interests in mind.
        1)  Enclosed are newspaper articles about the lead homicide detective in my case
– the very one who had direct influence on the showing of and putting together the pictures that
were used in the photo array that was shown to the witnesses – to which there are questions of
misconduct not just in the photos themselves, but as to the genuine legitimacy of the  time this
detective had to guide, entice or influence the first witness's decision (see photo array).  This
detective states that as soon as he opened the photo array packet witness No. 1 right away points
to me - no more than seconds. But the photo array sign and time show it took over 25 minutes to
do so (see Huntley Hearing, pg.11, line24 and pg.13, line 16).  Then, this detective goes to
witness No. 2's house and upon arriving, they find this witness on the phone.  There are issues
here that I believe are not right and the fact that this homicide detective is under federal arrest on
charges of wrong doing and has been suspended from his duties gives light to these issues on
identification only because I believe I was used as the scapegoat by my lawyer, the detectives
and the District Attorney's office for a conviction.  The fact that I was never given the
opportunity to confront my accusers is but one more issue on this and I believe a hearing if not a
new trial would help bring out a lot that has been unsaid by a lawyer who did not have my best
interest in mind and who knew that his firm was representing two people for the same crime
from the beginning and still chose to ignore it and when confronted about it, lied to the Court
along with the DA who mislead the Court throughout the Gomberg hearing into believing there
was only a meaningless potential of a conflict of interest when in fact he was well aware of the
full blown conflict by representing the issues of the John Doe hearings in a false and misleading
way and then withholding the information, to which in and of itself is considered Rosario
material.  So I ask the Court to see my issues as worthy of attention and grant me a hearing
where I can present my claims properly.
        2)  Also enclosed is a recent ruling on one of the same issues I have in front of the
Court.  Although it is from the Second Circuit, I believe the law is in time with my issue and I

ask that it be considered under the conflict of interest because not only does it have law under the conflict, but also because I believe that my lawyer and his firm were acting under the same scheme as noted in the transcript that is attached with the ruling with the Second Circuit Court where the attorney who may be called as a witness be disqualified due to conflict of interest. My lawyer also acted in the fashion when he made an application to the Court to allow him to testify for me (see transcript 1283, lines 6,7,8,9,10).

I would like to apologize for presenting this in this way but I am pro se in my petition and only know this means of addressing an issue and ask that the Court not hold it against me for doing such.

In closing, I ask to please consider all this new information and the petition as a whole and I also would like to inform the Court of my address change which can be found at the top of this letter. I thank you for your time and await your response.


Respectfully,

Mario Zanghi



ARRESTS

The
we heard
ness cards
and circum
schools

Ort
...
or ...
...
Ca...
...
the feds
About 10 phon
tween Ortiz and
wiretapped c...

Police Com...
Dilna said a number of
has hung over Ortiz for
years. In August 2001,
searched ...
lockers ...
tectives, looking for evide
bribes ...
ers. Next ...
er charged ...
search ...

frequent ...
low offi...
fairly ta...

"(Ortiz) was rumored ...
ed and arrested ...
said Wat...
cer try to smuggle ...
under ...
tice will be set...
integrity ...
sion. We ...

The ...
Carey Cantw...
conversati...
difficult ta...
allegations ...
faces ...
phone ...
and (Ortiz) w...
...
...
long lin...
...
...
and ...
said, long ...

"Because ...
we realized ...
...
...
...
...
...

'I t
unti

# Detective knew for years he was FBI target

BY LOU MICHEL
AND DAN HERBECK

NEWS STAFF REPORTERS

Detective Andres "Andy" Ortiz knew the FBI had been targeting him for years.

In August 2001, agents searched his locker and desk at Police Headquarters, looking for evidence of bribery and shake-downs of drug dealers. No charges were ever filed in connection with those searches.



After that, Ortiz made no secret that he was upset with the FBI. He told fellow officers the federal government had wrongly and un-fairly targeted him.

On Thursday, wire-tapped conversations between the detective and Franklin Johnson, an accused marijuana kingpin, led to Ortiz's arrest on a felony count of using a telephone to facilitate drug traf-ficking.



**Andres Ortiz says the truth will come out.**

According to court papers, Ortiz as-sisted the drug ring on three separate oc-casions last June:

• On June 27, agents said they recorded Ortiz warning Johnson that "the ----ing feds" were investigating Johnson and his associates.

• After Rashawn Demer, one of John-son's alleged henchmen, was taken in for questioning about some shootings on June 28, Ortiz arranged to have Demer re-leased to Johnson's custody, with no char-ges placed against Demer.

• Also on June 28, Ortiz warned John-son by telephone not to go to a meeting with a former member of the Donald "Sly" Green drug ring. Ortiz told Johnson that Green's associate was probably under in-vestigation by federal agents.

"(There) is no legitimate reason for Or-tiz to have released confidential informa-tion to a known major narcotics traffick-er," FBI Agent Brian L. Cid said in the court documents. "Intercepted telephone conversations indicated that Johnson con-spires with Detective Andres Ortiz to fur-ther his drug trafficking activities."

In a Friday interview at his Amherst home, the 48-year-old Ortiz said that when the whole story comes out, people will see that he was only trying to help his department solve some cases of drug-re-lated violence.

"The truth will come out," he said, sit-



**Julia Jones is one of 200
replace the rotted wood**

# Mix

## City officials
## program lac
## 'sense of urg

BY BRIAN MEY

NEWS STAFF REPOR

At 82, Julia Jones ha
enough Buffalo winters t
running out of time this so
her Michigan Avenue hor
rotting wood above her po

She had hoped to ha
done this spring, shortly
plied for a rehabilitation I
the city.

The paint continues
wood continues to rot. Th
her fault, but the city's, of

Jones is among 200 ci
ers who have waited as
years for loans for such w
ing leaky roofs, fixing po
placing windows.







arts organizations around the country," said BPO Board Chairman Angelo Fatta.

The BPO finished three of the four previous seasons in the black. The exception was fiscal 2001-02, when state and local funding cuts in the aftermath of the terrorist attacks of Sept. 11, 2001, wreaked havoc on cultural budgets.

Highlights of the orchestra's 2003-04 season included:

• Total attendance of more than 190,000 for 130 concerts and events.

• National Public Radio broadcasts that reached millions of listeners across the United States and Canada.

• Music education programming for 161 local schools benefiting 27,363 students.

See **Deficit** on Page B2

---

**aron Cantillon/Buffalo News**
**vices for Sgt. David L.**

e monsignor said.

mily members and the
ary family provided a
to Roustum, a mixture
cision and personal trib-
John Vianney Church
Holy Cross Cemetery,

me an all-too-familiar

n Page B2

---

**ic woes**



**haron Cantillon/Buffalo News**
**, director of Episcopal**
**art the pantry in 1987.**

e News Neediest Fund,
so try to distribute extra
last more than a day.

to the holiday meal,
diest Fund, along with
dozen other local pro-
toys collected and dis-
gh the Western New
Partnership.

holiday season, toy do-

n Page B2

---



# Former officer gives inside look at extent of corruption

### BY DAN HERBECK
NEWS STAFF REPORTER

Rene Gil knows all about crooked cops in the Buffalo Police Narcotics Unit.

He was one of them.

Gil, 45, an ex-cop and admitted cocaine trafficker, offered a disturbing inside look at police corruption Monday while appearing as a witness in the federal trial of suspended Detectives Paul D. Skinner and Sylvestre Acosta.

Testifying for more than four hours, Gil told how some narcotics investigators stole money on drug raids, planted drugs on suspects and lied to judges to get search warrants. He also spoke about his own drug dealing, which went on for more than a year before he was caught by the FBI in May 2001.

While alleged corruption in the Narcotics Unit has been discussed in news reports for more than a decade, Gil is the first former detective from the unit to testify in detail about the illegal acts.

"Would you steal every time you executed a search warrant?" Assistant U.S. Attorney James P. Kennedy asked Gil.

See **Trial** on Page B2

---

# Hidden camera catches divvying-up of drug cash

**TRIAL** • from B1

"No," Gil answered. "If the right people were there, (people) who had done this before, we would do it."

"Who were the right people?" the prosecutor asked.

Gil identified himself, Skinner and Acosta as three who would take part in thefts. He also identified Skinner's brother, Gerald T. Skinner, who is already in prison for such activity, and Andres Ortiz, a suspended detective who was recently arrested on charges of providing information to a drug dealer.

The short, gray-haired former narcotics investigator testified that he and other detectives — sometimes including Acosta and Paul Skinner — would split up thousands of dollars of loot taken illegally from the homes of drug dealers.

In early 1998, Gil said, detectives stole thousands during a raid on West Delavan Avenue. He said the cash was in a secret compartment in the frame of a water bed. He said Gerald Skinner gave him and Acosta $1,000 each. He said Paul Skinner later complained he never received his share.

When he told Gerald Skinner of his brother's complaint, Gil said, Gerald Skinner responded: "(Expletive) my brother. He didn't take care of me when he ripped off the Jamaicans last week. Why should I take care of him?"

Gil said a number of detectives were well aware for years that the FBI was conducting an investigation into their activities. In late 1998, he said, a group of detectives met on the West Side, where they sat in Paul Skinner's truck and discussed what they would do if one of them got caught.

"If one of us were to get caught and went to jail, he would keep his mouth shut, and the rest of us would take care of his family," Gil said the detectives decided.

He said Acosta, Gerald Skinner and Paul Skinner's then-partner, Robert Hill, were also present for the discussion. Robert Hill is also serving a federal prison term for stealing drug money.

Gil also disclosed that in February 1998, a hidden camera — installed in the Narcotics Unit office by a commander...

the camera, Gil went to his captain and explained he was only paying back some money that two other detectives had lent him. He testified that the incident led to his leaving the Narcotics Unit and transferring to the Sex Offenses Squad.

Gil, who agreed to cooperate with the FBI and took a plea deal more than two years ago, was the 13th witness in the trial of Paul Skinner, 46, and Acosta, 50, who are accused of violating the civil rights of drug suspects.

The verdict, which could come late this week or sometime next week, is likely to turn on how much credibility jurors give to Gil and other witnesses, including jailed drug dealers and informants.

Defense attorneys Patrick J. Brown and John J. Molloy hammered away at Gil for hours, portraying him as a liar who would turn against friends in exchange for a shortened prison sentence.

Gil acknowledged that he was selling drugs for a major cocaine trafficker in Buffalo before FBI agents caught him arranging a cocaine purchase for his ex-wife. He also said he helped a nephew to deal drugs by telling him which cars were being used by narcotics investigators.

He told Brown that he recently took a guilty plea to grand larceny charges in Florida, where he began working in a pawnshop after taking his plea deal.

"Do you have difficulty telling the truth?" Brown asked.

"Not now, I don't," Gil said.

Gil said he was introduced to drug investigations in 1989, when he was part of a group of officers detailed to attack drug trafficking on Maryland Street. He said he was taught to get arrests "by whatever means necessary," regardless of civil rights concerns.

Later, Gil said, he was working with Ortiz when Ortiz stole a wad of cash from a West Side drug suspect. He said Ortiz pocketed the money and let the suspect go, saying, "This is your lucky day. Now get out of here."

Ortiz later gave him $150, calling it "lunch money," Gil testified.

Kennedy asked Gil why some city detectives took "shortcuts" — such as planting evidence or using false information on search warrants — in their inves...

Mr. Herbert Greenman, and we're here to commence

the conducting of Wade and Huntley hearings.

People call Detective Andres Ortiz.

A N D R E S    O R T I Z , having first been duly sworn,

testified as follows:

THE CLERK:    State your name.

THE WITNESS:    Andres Ortiz, O-R-T-I-Z,

A-N-D-R-E-S.

THE CLERK:    Thank you.

DIRECT EXAMINATION BY MR. MARUSAK:

Q.    Detective Ortiz, how long have you worked for the

Buffalo Police Department?

A.    Be sixteen years in February.

Q.    How long have you been assigned to the Homicide

Bureau?

A.    Since January this year.

Q.    Directing your attention to July 22nd of this

year, did you participate in the investigation into the July

20th shooting death of Abdul Bodden?

A.    Yes, sir.

Q.    And on that date did you, yourself, prepare a

photo array in connection with that investigation?

A.    Yes, sir.

Q.    I'm showing you now what has been marked People's

1   Exhibit 1 for identification.  Please take a look at both

2   pages of that.  Is that the photo array that you assembled?

3        A.     Yes, sir, it is.

4        Q.     And as you look at it now in terms of the photos

5   that are in the slots in the manner in which they are affixed

6   there, is that photo array accurate and fairly depict the

7   photo array that you assembled back on July 22nd?

8        A.     Yes, sir.

9        Q.     Now, does the defendant, Mario Zanghi's photo

10  appear in that array?

11       A.     Yes, sir, it does.

12       Q.     What number is it?

13       A.     Position marked number five.

14       Q.     Now, on the day before, namely, on July 21st,

15  1995, were you working?

16       A.     Yes, sir.

17       Q.     And on the 21st of July did information come to

18  you in your role as a homicide detective as regards this

19  defendant being a suspect in the July 20th shooting?

20       A.     Yes, sir.

21       Q.     And what source -- what was the source of that

22  information?  Who was it?

23       A.     PO from Precinct 6, Calloway, called Homicide

24  Bureau Office?

25

Ortiz - Direct - Marusak                8

1

2    A.      What -- did you speak yourself with Officer

3    Calloway?

4    A.      Yes, sir, I did.

5    Q.      Over the phone?

6    A.      Yes.

7    Q.      What did he inform you?

8    A.      He stated that he had received information that

9    the people involved in the shooting on Bryant Street were

10   Mario Zanghi and Ralph Amoia.

11           THE COURT:   Excuse me.  You were speaking to

12       Officer Calloway or the information came to Officer

13       Calloway?

14           THE WITNESS:   I was speaking to Officer

15       Calloway.

16           THE COURT:   All right.  Who in turn allegediy

17       received information from?

18           THE WITNESS:   Lieutenant Leggio -- he's PO

19       Leggio, I'm sorry, from Precinct 6.

20           THE COURT:   That?

21           THE WITNESS:   That Ralph Amoia and Mario

22       Zanghi were involved in the shooting of Bolden on

23       Bryant Street.

24   Q.      You mean Bodden, B-O-D-D-E-N?

25   A.      Yes.

                          Ortiz - Direct - Marusak                    9

1

2        Q.     In reference to the police officer from whom

3   Calloway learned this information, do you remember that

4   officer's name?

5        A.     Repeat that, please.

6        Q.     You spoke with who over the phone?

7        A.     Calloway.

8        Q.     And what is your understanding as to what officer

9   provided Calloway with the information, do you remember?

10       A.     Yes, I do.  I'm sorry.  I said Leggio.  It was

11   Mike Elliott.

12                   THE COURT:   It was who?

13                   THE WITNESS:   Mike Elliott.

14                   THE COURT:   Officer, before you answer on an

15              important matter such as this, I would ask you to

16              give it some thought.  Information from Mike --

17                   THE WITNESS:   Elliott.

18                   THE COURT:   Thank you, sir.

19       Q.     Now, after learning that -- after learning that

20   information, did you put together that photo array?

21       A.     Yes, sir, I did.

22       Q.     And were you operating under any time restraints

23   as regards to who you wanted to show this photo array to?

24       A.     Yes, sir, we were.

25       Q.     Could you please explain that?

Case 6:99-cv-06293-CJS   Document 26   Filed 04/22/05   Page 13 of 54

1

2     A.      The two young men, Mr. Evans and Turpin, were at

3 home at the time and they were on -- they were going to

4 attend the funeral of Mr. Bodden in New York City and they

5 were going to leave that afternoon.

6     Q.      And when you say that afternoon, you mean the

7 date of what?

8     A.      22nd.

9     Q.      And did you understand Mr. Evans and Mr. Turpin

10 to be eyewitnesses to this shooting?

11     A.      Yes, sir.

12     Q.      When you put together the photo array, Detective

13 Ortiz, what were you looking for in terms of the other

14 photographs that you used as opposed to the defendant's

15 photo?

16     A.      Well, we had to get people with a similar build

17 and hair style, so we were limited in the pictures that we

18 could use.

19     Q.      When you say similar build, are you referring to

20 the facial features?

21     A.      Correct.

22     Q.      After putting together the photo array, who was

23 the first witness that you showed the array to?

24     A.      Mr. Evans.

25     Q.      And did you do that at his home?

Ortiz - Direct - Marusak                    11

1

2      A.      Yes, sir, we did.

3      Q.      And how did you make arrangements to show Mr.

4  Evans the photo array?

5      A.      We had called him on the phone to see if he would

6  be available.

7      Q.      Who were you working with?

8      A.      Detective Sergeant Lipinczyk.

9      Q.      And do you remember which of the two of you spoke

10  with Mr. Evans?

11     A.      I did.

12     Q.      What did you advise him?

13     A.      I just told him we had some pictures we would

14  like to bring by for him to look at.

15     Q.      What did he say in response to that?

16     A.      He said, sure, he'll be available for a short

17  period.

18     Q.      What time of the day was this, Detective?

19     A.      That I called, had to be about 10:40.

20     Q.      In the morning or in the evening?

21     A.      In the morning.

22     Q.      Do you remember about what time you arrived at

23  his residence?

24     A.      At approximately 11 A.M.

25     Q.      And besides you and Detective Sergeant Lipinczyk,

1

2   were any other officers with you?

3       A.      No, sir.

4       Q.      Could you please tell the Court now what happened

5   upon your arrival at Mr. Evans' residence?

6       A.      We entered the house.  He welcomed us in and we

7   went into the, I believe it was the kitchen.  Told him that

8   we had a photo array of people that we would like him to view

9   to see if he could recognize anybody that was involved in the

10  incident.  We placed the photo array on the table with the

11  photos covered.  He opened the top covering of the photo

12  array, looked at the photo array and picked out the

13  individual in slot five.

14      Q.      How much time elapsed between the time you

15  displayed the six photos until the time that he picked out

16  slot number five?

17      A.      Oh, it was within ten seconds, I would say.

18      Q.      And is that your best estimate?

19      A.      Yes, sir.

20      Q.      And did he say anything upon making that

21  identification?

22      A.      Yes.  He said that he's the one who shot Abdul

23  Bodden.  He shot Abdul Bolden.

24      Q.      Now, after he made that identification did you

25  record or memorialize the identification?

Ortiz - Direct - Marusak                    13

1

2     A.      Yes, sir.

3     Q.      Detective, I'm going to now refer you to the

4  reverse side of the front page of the photo array and ask you

5  if there is a memorialization of the identification there?

6     A.      Yes, there are.

7     Q.      Please explain to the Court how that occurred.

8     A.      Well, once he identifies the individual in the

9  slot, we have him sign a sticker here that we have him place

10  on the position where the slot was and it states what he said

11  and that he identified the individual in slot number five.

12    Q.      Did you ask Mr. Evans to sign that sticker?

13    A.      Yes.  He signs it and it's dated and timed and

14  initialed by both myself and Sergeant Lipinczyk.

15    Q.      What time does it reflect?

16    A.      11:22 A.M.

17    Q.      How does it describe the identification?

18    A.      Shot Abdul Bodden.

19    Q.      Now, I'm going to show you what has been marked

20  as People's Exhibit 2 for identification.  Do you recognize

21  that?

22    A.      Yes.

23    Q.      And does that appear to be -- tell us what it is?

24    A.      This is our standard P-88 form that we put with

25  the photo arrays to who views them and what they pick out and

Ortiz - Direct - Marusak                    14

2  they say when they pick it out.

3      Q.    Did you fill out the document?

4      A.    No.  This one was made out by Sergeant Lipinczyk.

5      Q.    In your presence?

6      A.    Yes, sir.

7      Q.    Who signed it?

8      A.    Robert Evans.

9      Q.    And is there any other signature on there?

10     A.    Subscribed and notarized by Sergeant Lipinczyk.

11     Q.    Was this document filled out at the time shortly

12  following the identification procedure?

13     A.    Yes, immediately.

14     Q.    And but for the redaction of the address and

15  phone number of the witness, is this a complete and accurate

16  copy of this affidavit?

17     A.    Yes, sir.

18     Q.    Detective, up until that point in time had you

19  shown this witness any photographs or conducted any

20  identification procedures?

21     A.    No, sir.

22     Q.    To your knowledge, had any such identification

23  procedures or other photos been shown to this witness?

24     A.    No, sir.

25     Q.    About how long would you estimate you remained at

1  Mr. Evans' residence for purposes of this identification

2  procedure?

3       A.     Approximately twenty-two minutes.  As soon as we

4  were done, we left.

5       Q.     And to whose residence did you then go?

6       A.     To Mr. Turpin's house.

7       Q.     And it took you about how long to get there?

8       A.     It was right around the corner, about less than

9  five minutes.

10      Q.     Still in Buffalo?

11      A.     Yes, sir.

12      Q.     And can you please describe for the Court now how

13  you met -- met with Mr. Turpin at that point?

14      A.     Well, we knocked on the front door and he opened

15  the door and invited us in.

16      Q.     Before actually arriving at his house, had you or

17  your partner made any contact with Mr. Turpin earlier in the

18  day?

19      A.     No, sir.

20      Q.     To your knowledge, were there any arrangements

21  made for you to meet him?

22      A.     Oh, yes.  We did call to see if he'd be available

23  to view the photo array.

24      Q.     When did you do that?

1

2    A.    Probably about 10:40, the same time that we

3    called Mr. Evans.

4    Q.    And did you make those arrangements or did your

5    partner?

6    A.    I did.

7    Q.    What did you tell Mr. Turpin?

8    A.    I just asked him if he'd be available for a few

9    minutes to view the pictures that we have.

10   Q.    And what did he say?

11   A.    He said sure.

12   Q.    Please tell us, then, after entering the

13   residence of Mr. Turpin what you did?

14   A.    We went into another room, which would be the

15   second room, dining room, second room, placed the photo array

16   on the table there, covered, and asked him to remove the

17   cover and see if he could identify anybody that was at the

18   shooting.

19   Q.    And, again, was your partner with you, Detective

20   Sergeant Lipinczyk?

21   A.    Yes, sir.

22   Q.    What happened at that point?

23   A.    He immediately pointed to slot number five and

24   stated, this is the one who shot Bodden and shot at me.

25   Q.    Now, before showing Mr. Turpin the photo array

1  did you ask him any questions?

2      A.      Yes, sir, I did.

3      Q.      What did you ask him?

4      A.      Well, when he opened the door, he was on the

5  telephone, and I asked him who was on the phone.  And he

6  stated some other name, which I didn't really pay attention

7  to.  And I had asked him if he had talked to Mr. Evans and he

8  said no.

9      Q.      Now, did you memorialize Mr. Turpin's

10  identification in the same fashion as you had Mr. Evans'

11  identification?

12      A.      Yes, sir, we did.

13      Q.      And looking on the reverse side again of People's

14  Exhibit 1, is there a similar signature sticker for Mr.

15  Turpin's identification?

16      A.      Yes, sir, there is.

17      Q.      Was that signed and dated?

18      A.      Yes, sir, it is.

19      Q.      And showing you People's Exhibit 3 marked for

20  identification, is that a similar affidavit that Mr. Turpin

21  signed in your presence regarding this procedure?

22      A.      Yes, it is.

23      Q.      Is that a true and accurate copy of the affidavit

24  but for the address and phone number being redacted?

1

2          A.      Yes, sir.

3          Q.      And, to your knowledge, Detective -- well, had

4     you shown any photos or conducted any identification

5     procedures or had any been done in your presence to this

6     witness prior to this day?

7          A.      No, sir.

8          Q.      And, to your knowledge, had there been any other

9     photos or identification procedures conducted with Mr. Turpin

10    prior to this?

11         A.      No, sir.

12         Q.      Now, up until this point in time, and I'm

13    speaking of the time after which you had shown the photo

14    array to both witnesses, up until that point in time had

15    there been any arrest warrants issued for the defendant,

16    Mario Zanghi?

17         A.      No, sir.

18         Q.      Up until that point in time had there been anyone

19    identified as the shooter besides Mario Zanghi?

20         A.      No, sir.

21         Q.      Upon your concluding the identification procedure

22    with Mr. Turpin, where did you go?

23         A.      We returned back to the Homicide Office.

24         Q.      What was physically -- what was done with the

25    photo array?

1

2    A.    It was put back within the folder and put into

3 the -- it wasn't put in -- we maintained the file open

4 because we were going to see, as far as to get him, you know,

5 picked up to be brought in.

6    Q.    But in terms of the physical location of this

7 photo array, where was it kept?

8    A.    In the Homicide Office.

9    Q.    Did you disclose or show this photo array to

10 anyone outside the Homicide Office not connected with the

11 Buffalo Police Department, Homicide Bureau?

12    A.    No, sir.

13    Q.    Did you disclose or reveal to anyone any photos

14 of this defendant, including the photo that was used for this

15 photo array?

16    A.    No, sir.

17    Q.    Did that conclude that day your involvement in

18 terms of identification procedures with this case?

19    A.    Yes, sir, it did.

20    Q.    Were you involved in any way with the arrest of

21 the defendant, Mario Zanghi?

22    A.    No, sir.

23    Q.    Prior to testifying today what did you review?

24    A.    My P-73 with the conversation and the other P-73

25 with the photo array.

Ortiz - Direct - Marusak                    20

Q.      When you say the P-73 concerning the
conversation, are you referring to the conversation with
Officer Calloway?

A.      Yes, sir.

Q.      Did you also have an opportunity to review the
photo array itself, as well as the affidavits?

A.      Yes, I did.

        MR. MARUSAK:    Thank you, Your Honor.  I would
        offer at this point People's Exhibits 1, 2 and 3.

        MR. GREENMAN:    I have no objection, Your
        Honor.

        THE COURT:    Received.

        (Whereupon, People's Exhibits 1, 2 and 3 were
        received and marked in evidence.)

CROSS-EXAMINATION BY MR. GREENMAN:

Q.      Detective, before these phone conversations you
had with Mr. Turpin and Mr. Evans, had you talked with them
prior to that time?

A.      With -- yes, sir, I did.

Q.      With Mr. Turpin or Mr. Evans?

A.      Yes, sir, I did.

Q.      Can you tell us the first time you spoke with
them?  Let's take Mr. Evans first.  Did you speak with Mr.
Evans before you spoke with him on the phone on the 22nd of

July?

    A.    I'm sure I did.

    Q.    Well, let me ask you, Detective.  Aside from People's Exhibit 2 and 3, which are the documents you referred to which were filled out at the identification of the array, did you make any other notes with respect to this investigation, handwritten notes?

    A.    Yes, sir, I did.

    Q.    All right.  And did you make any handwritten notes with respect to conversations you earlier had with either Mr. Turpin or Mr. Evans?

    A.    Yes, sir.

    Q.    Do you have those with you, sir?

    A.    They would be within the file.

        MR. MARUSAK:   Judge, I have no notes of this witness as regards any of the topics related to this hearing.  I have no notes relating to the identification procedure or the conversations he had with the witnesses in this regard, as well as notes relating to his conversation with Officer Calloway.  All I have are the P-73s and the affidavits themselves and that was my understanding after talking with this witness.

        THE COURT:   Well, whether or not

1          Ortiz - Cross - Greenman                22

2     documentation that this officer may have reduced to

3     writing following conversations with either of

4     these witnesses is relevant to the questions

5     presented at this hearing, I don't know, without

6     knowing what's contained within the exhibit.  Now,

7     the officer said that he had spoken to Evans,

8     presumably at some time subsequent to the shooting

9     that occurred on the 20th of July, '95.  So some

10    time between July 20th and July 22nd had you spoken

11    to the two other apparent witnesses to this event,

12    Turpin and Evans?

13         THE WITNESS:   Yes, sir.

14         THE COURT:   Okay.  And did your conversation

15    with them -- was it memorialized by a report of

16    some kind?

17         THE WITNESS:   I took a statement from one of

18    them.

19         THE COURT:   Okay.  Did -- separate and apart

20    from their statements, did you prepare any kind of

21    report of your own?

22         THE WITNESS:   There's a P-73 for the activity

23    of the case.

24         THE COURT:   So there's a P-73 and then there's

25    a formal statement taken from each with respect to

2    their observations surrounding the incident and

3    your conversation with them about it?

4           THE WITNESS:   Yes, sir.

5           THE COURT:   And did -- was there portions of

6    that statement that bore upon their identification

7    of their assailant?

8           THE WITNESS:   Yes, sir.

9           THE COURT:   Then it seems to me, at least in

10   part, is bearing upon the subject matter of this

11   identification procedure and its fairness and the

12   like.

13          MR. MARUSAK:   Judge, what I have is, it's my

14   understanding that this witness took a formal

15   statement only from one of the witnesses.

16          THE WITNESS:   Correct.

17          MR. MARUSAK:   That's Mr. Turpin.

18          THE COURT:   Okay.

19          MR. MARUSAK:   And I have a description -- I

20   have redacted that portion of the statement that

21   refers to a physical description of the shooter

22   from Mr. Turpin.

23          THE COURT:   Well, if it's Turpin we're

24   talking about, fine.   I think that's where Mr.

25   Greenman is going, a conversation with Turpin

Ortiz - Cross - Greenman                          24

relative to his identification of the assailant.

And you've now provided that portion of his P-73

that bears upon it or is this Turpin's statement

with respect to --

MR. MARUSAK:    Judge --

THE COURT:    Just a minute.

MR. MARUSAK:    I'm sorry.

THE COURT:    Or is this a portion of Turpin's

statement to the police, which?

MR. MARUSAK:    The portion I've provided is a

portion of Mr. Turpin's statement on July 20th in

which he gives a description.  There's no

identification made, but simply a physical

description of the shooter.

THE COURT:    Fine.  Let's proceed.  Mr.

Greenman, you have that.

MR. GREENMAN:    Detective, aside from the

typewritten -- why don't you mark this.

(Whereupon, a one-page document was marked

Defendant's Exhibit A for identification.)

BY MR. GREENMAN:

Q.    Showing you what's been marked as Defendant's

Exhibit A, what do you recognize this document to be?

A.    It's a question -- the answer to a question of

Ortiz - Cross - Greenman                          25

1

2   part of his statement.

3       Q.      His being whom?

4       A.      Mr. Turpin.

5       Q.      And where was Mr. Turpin when you took this

6   statement?

7       A.      In the Homicide Bureau office.

8       Q.      And were you making any handwritten notes, sir,

9   with respect to your conversation with Mr. Turpin?

10      A.      No, sir.

11      Q.      The document that you have in your hand would

12  only be the -- would be the only memorialization of your

13  conversation with Mr. Turpin?

14      A.      Yes, sir.

15      Q.      How long did your meeting last with -- by the

16  way, was this on July 20th of 1995?

17      A.      Yes.

18      Q.      Can you give us your approximate -- your best

19  approximation as to what time this conversation took place?

20      A.      I would say it was probably 6:30, seven in the

21  morning.

22      Q.      All right.  Now, was anyone else present beside

23  you and Mr. Turpin?

24      A.      No, sir.

25      Q.      Now, can you tell us, Detective, the description

that Mr. Turpin gave to you when you were talking with him on

the 20th?

A.      It was a white male, large build, basically.

Q.      He did -- first of all, how many people did he

describe?  More than one person?

MR. MARUSAK:   Objection to the form.

MR. GREENMAN:   I'll rephrase it, Judge.

THE COURT:   Well, go ahead.

Q.      You were talking with him about a shooting that

had taken place over on Bryant, correct?

A.      Yes, sir.

Q.      And were you asking him to describe any of the

people he had seen that evening?

A.      I believe I asked him if he could identify them.

Q.      I'm sorry?

THE COURT:   Excuse me.  Is it them or were

you seeking to describe the person who discharged

the weapon?  I guess that's the first question.

Were you just seeking a description of anyone who

may have been present as the assailants?

THE WITNESS:   I believe I asked him to

identify the person that did the shooting.

THE COURT:   And he gave the description of

what?

Ortiz - Cross - Greenman                    27

1

2          THE WITNESS:   A muscular built male, I forget

3      exactly, and he described --

4          THE COURT:   Well, you got it in front of you,

5      Mr. Greenman.

6          MR. GREENMAN:   I'm sorry, Judge.  I'll give

7      it to him.

8          THE COURT:   Take a look at it.  Refresh your

9      recollection.  Is that the description you gave and

10     tell me what it was?

11         THE WITNESS:   Two guys, they were pretty

12     stocky, like weight lifters, healthy, big.  The guy

13     with the gun was the bigger one.  He had dark hair

14     and so did the driver.  They both had on

15     light-colored shirts, short sleeves.

16     Q.    Now, was that the extent, Detective, as you

17 recall, of the description that he gave, that is, Mr. Turpin?

18     A.    Yes, sir.

19     Q.    Now, like in the description, I believe you

20 referred to another person, is that correct, a second person?

21     A.    Yes, sir.

22     Q.    Did you get a description as to what that

23 individual was wearing, aside from what you've just described

24 or read from in Defendant's Exhibit 1 -- or A?

25         MR. MARUSAK:   Objection to the relevance of

Ortiz - Cross - Greenman                    28

the other person.

THE COURT:   Well, you want the other person

present, is that what you're talking about, the

description of the other person present?

MR. GREENMAN:   That's correct, Judge.

THE COURT:   Well, I'll take it if it's part

of the written reference.

THE WITNESS:   No, sir.

Q.    Now, other than the description that you have

memorialized on this typewritten page, was there a further

description of the person that he described wearing -- at

least as being having a stocky build and wearing a

light-colored shirt?

A.    What do you mean by another description?   From

where?

Q.    Well, he told you that the one person had dark

hair; is that correct?

A.    Yes, sir.

Q.    And did you ask him at least the coloration of

the hair aside from being dark?

A.    I don't recall.

Q.    Did you -- you don't recall asking him or you

don't recall whether he gave you a further description?

A.    Both.

Ortiz - Cross - Greenman                    29

1

2    Q.    Did you ask him about the length of this

3 individual's hair?

4    A.    I don't think I went that far in the statement.

5    Q.    Now, I apologize, but I can't recall if you

6 indicated you took a sworn statement from another individual

7 or did you take a sworn statement from Mr. Turpin?

8    A.    I took a sworn statement from Mr. Turpin.

9         MR. GREENMAN:   Judge, I'd ask that be

10        produced at this point in time.

11        THE COURT:  Denied.  Come on.  Let's get to

12        the point in time that we're dealing with and that

13        is the actions of the 22nd and the propriety or

14        impropriety of this array as being suggestive or

15        not relative to the witnesses' ability to identify

16        the perpetrators involved in this event.  This is

17        not a full-fledged discovery proceeding in which we

18        are to embark upon every aspect of the case.

19    Q.    Detective, let me ask you this.  Before you

20 showed these arrays to Mr. Turpin and Mr. Evans, on I believe

21 the 22nd, had you prepared any other arrays with respect to

22 this case?

23    A.    No, sir.

24    Q.    To your knowledge, had anybody been asked to

25 observe or look at any photographs of possible suspects?

2   A.      I don't believe so.

3   Q.      Now, you've indicated that the arrays that -- I'm

4   sorry, the array that you prepared was obtained from mug

5   shots; is that correct?

6   A.      Yes, sir.

7   Q.      And the six photographs that I have here in

8   People's Exhibit 1 that I'm showing are all mug shot

9   identification, mug shot photographs; is that correct?

10   A.      Yes, sir.

11   Q.      Now, can you tell me, sir, where you got Mr.

12   Zanghi's photograph?

13   A.      From the Photography Unit.

14   Q.      And --

15          THE COURT:   I didn't hear it.

16          THE WITNESS:   From the Photography Unit.

17   Q.      Is that a unit located within Buffalo Police

18   Headquarters?

19   A.      Yes, sir.

20   Q.      And do you recall where you obtained the

21   photograph from, that is, from whom?

22   A.      No.   There was -- upstairs in the office there

23   they have a bunch of pictures that are used to pick out

24   look-alike individuals.

25   Q.      Well, did you ask for a photograph of Mario

1  Zanghi?

2      A.     Yes, sir.

3      Q.     And were you given one photograph of him or were

4  you given more than one?

5      A.     There was two.

6      Q.     And the photograph that's depicted in People's

7  Exhibit 1, that was one of the two photographs that you were

8  given?

9      A.     Yes, sir.

10     Q.     And the second photograph, was it the same

11 photograph as appears in this array?

12     A.     Yes, sir.

13     Q.     So there were actually two photographs of the

14 same person; is that correct?

15     A.     Yes, sir.

16     Q.     Now, did you take both photographs with you?

17     A.     No, sir.

18     Q.     You left one there?

19     A.     Yes, sir.

20     Q.     Were you aware, Detective, that Mr. Zanghi's

21 photograph appeared in the Buffalo News?

22               MR. MARUSAK:   Objection to the form of the

23          question as to what day we're talking about.

24               THE COURT:   Sustained.  Too broad a question.

Ortiz - Cross - Greenman                    32

2        (Whereupon, a two-page document (article) was

3    marked Defendant's Exhibit B for identification.)

4    Q.    Detective, showing you what's been marked as

5    Defendant's B for identification, do you recognize the

6    photograph that appears on that sheet of paper, the top sheet

7    of paper?

8    A.    Yes, sir.

9    Q.    And whose photograph is that?

10   A.    Mario Zanghi.

11   Q.    And as you look, sir, at People's Exhibit 1 in

12   evidence, is that, at least that one photograph, the same

13   photograph that appears on the photographic array, the left

14   of his photograph?

15   A.    It looks the same.

16        MR. GREENMAN:   Judge, I have the original,

17        the newspaper article, if you need it.

18        THE COURT:   Well, I'm looking at Defendant's

19        B, which is dated, if accurate, July 23rd, '95, a

20        report in the newspaper suggesting officers charge

21        suspect in murder of college student.  And the

22        photograph as depicted in the News does appear to

23        be that as being the same as photo five left

24        profile.

25   Q.    Now, Detective, did you release that photograph

Ortiz - Cross - Greenman                              33

1    to the Buffalo News?

2         A.      No, sir.

3         Q.      Do you know who did, sir?

4         A.      No, sir.

5         Q.      Did you see this photograph in the newspaper as
6    it appeared on July 23rd?

7         A.      Yes, sir, I did.

8         Q.      Did you cause any inquiry to be made as to how
9    the Buffalo News obtained the same photograph that you were
10   showing at least the two prospective witnesses?

11        A.      No, sir, I didn't.

12        Q.      Was any inquiry made that you know of by the
13   Buffalo Police Department as to how it was that that same
14   photograph appeared in the Buffalo News?

15        A.      I couldn't tell you.

16        Q.      You testified, Detective, that you made a phone
17   call of the two men, Turpin and Evans, about viewing some
18   photographs at a later time; is that correct?

19                THE COURT:   Excuse me.  What later time?

20        Q.      On July 22nd you spoke with Turpin and Evans on
21   the phone; is that correct?

22        A.      Yes, sir, I did.

23                THE COURT:   That was prior to any publication
24                of the photograph in question of July 23rd, was the

Ortiz - Cross - Greenman                    34

2        stated publication.

3        Q.      And when you spoke with them, sir, did you have

4    their phone numbers available to you?

5        A.      Yes, sir.

6        Q.      Was it you who made the telephone calls?

7        A.      Yes, sir.

8        Q.      Now, who did you call first, do you recall?

9        A.      I don't recall which one I called first.

10       Q.      Did you reach them at different phone numbers?

11       A.      Yes, sir.

12       Q.      And did you ask, at least the first of the

13   persons you spoke with, did you ask them if you could come

14   over to his house?

15       A.      Yes, sir.

16       Q.      And you've testified that at some point during

17   the conversation you indicated that you wanted him to look at

18   some photographs?

19       A.      Yes.

20       Q.      Did you indicate to him that this was with

21   respect to this investigation, that is, the shooting that had

22   taken place on July 20th?

23       A.      I couldn't tell you if I really indicated that,

24   but I told him I wanted to show him pictures to see if he

25   could identify anybody.

Q.      Did you memorialize, sir, your conversation in a
report or handwritten note as to what you said to the first
person you spoke with?

A.      On the telephone?

Q.      Yes, sir.

A.      No, I didn't.

Q.      And when you spoke with the second individual,
did you also tell him that you wanted him to look at some
photographs?

A.      Yes, sir.

Q.      And do you recall the exact language that you
used in the second conversation you had with him?

A.      Well, I couldn't tell you the exact language, but
it was probably the same as the first one.

Q.      You didn't memorialize into any notes or
memorandum your second conversation?

A.      No, sir.

Q.      Did you ask them on the phone whether they had
viewed any other photographs before your telephone call to
them?

A.      No, sir.

Q.      Did you ask either one of them when you visited
them at their homes whether, in fact, they had seen other
photographs which were shown to them by anyone else?

Ortiz - Cross - Greenman                    36

1    A.    No, sir.

2    Q.    So whether, in fact, they had, indeed, looked at

3 other photographs you did not know at that time, true, when

4 you first visited them?

5    A.    True.

6    Q.    And the first person that you -- at least whose

7 home you went to was Mr. Evans' home; is that right?

8    A.    Yes, sir.

9    Q.    And can you tell us, sir, I'm not asking you

10 where he lived, but can you tell us, sir, in relation to

11 where Mr. Turpin was staying, the distance between the two

12 homes, how long it took you to get from one to the other?

13    A.    Within five minutes.

14    Q.    Now, when you had prepared the array, you had

15 also attempted to take -- at least to place into this array

16 five other mug shots, is that correct, of five other

17 individuals?

18    A.    Yes, sir.

19    Q.    And Mr. Marusak asked you some questions about

20 whether you were under any time constraints?

21    A.    Yes, sir.

22    Q.    When were these men going to leave for the

23 funeral, did they tell you?

24    A.    That afternoon.  I'm not sure what time.

Ortiz - Cross - Greenman                              38

1

2       Q.      We can see here that photos one, two, four and

3    six show individuals with white shirts on; is that correct?

4       A.      Yes, sir.

5       Q.      And Mr. Zanghi's shirt is a darker blue color; is

6    that correct?

7       A.      Yes, sir, it is.

8       Q.      Now, did you attempt, sir, in looking at the

9    third photograph, to do anything to hide that individual's or

10   to cover that individual's shirt?

11      A.      No, sir.

12      Q.      All right.  Could you tell, sir, before you put

13   the photograph into the slot what color shirt that individual

14   had?

15      A.      I really couldn't tell you.

16      Q.      If you take a look at it, Detective, and I think

17   if you could manipulate it a little bit, maybe you could see.

18      A.      Yes, sir.

19      Q.      What color shirt did that person have?

20      A.      Looks like possibly blue, dark in color.

21      Q.      All right.  And that shirt was covered by the

22   manner in which it appeared in the slot; is that correct?

23      A.      Yes, sir.

24      Q.      So the only individual whose at least shirt

25   coloration, aside from white, appears in the photographs is

1          Ortiz - Cross - Greenman                    39

2   Mr. Zanghi; is that right?

3          A.      Yes, sir.

4          Q.      Before showing the photographs to Mr. Evans, did

5   you ask him to give you any further description of the

6   individuals they had seen on July 20th?

7          A.      No.

8          Q.      Did he offer any further descriptions?

9          A.      No.  We really didn't exchange much conversation.

10         Q.      Essentially, in terms of facial features we have

11   something to the extent that they were stocky, like body

12   builders, and dark hair; is that correct?  That's basically

13   what you had to work from?

14         A.      Yes, sir.

15         Q.      Can you tell me, Detective, how long it took you

16   to prepare the array, People's Exhibit 1?

17         A.      I would say probably about half an hour.

18         Q.      How many photographs, sir, did you look at out of

19   all the photographs that were given to you at Buffalo Police

20   Headquarters?

21         A.      Probably a couple hundred.

22         Q.      That was not the extent of all the photographs

23   that they had at their availability, correct?

24         A.      No, sir.  There's more.

25         Q.      Did you ask to go any further than the

1                    Ortiz - Cross - Greenman           40

2 photographs that were initially given to you?

3     A.    No, sir.

4     Q.    Now, you knew that after you had seen Mr. Evans

5 you were going to go over to Mr. Turpin's home; is that

6 correct?

7     A.    Yes, sir.

8     Q.    Were any police officers sent over to Mr.

9 Turpin's home to ensure that he would not speak with Mr.

10 Evans or someone calling him on behalf of Mr. Evans?

11     A.    No, sir.

12     Q.    When you got to Mr. Turpin's home, was anybody

13 else home beside him?

14     A.    Yes, sir.  There was a young lady and a child.

15     Q.    You testified that he was on the phone when you

16 arrived?

17     A.    Yes, he was.

18     Q.    And did you ask him the name of the person you

19 were speaking with?

20     A.    Whom he was speaking with?

21     Q.    Yes, sir.

22     A.    Yes, I did.

23     Q.    What was the name of that person?

24     A.    I said I couldn't recall.

25     Q.    Your testimony was something to the extent that

1

2  you asked him if he had talked with Mr. Evans; is that

3  correct?

4       A.    I asked him who he was speaking with and then I

5  asked if Mr. Evans had called him.

6       Q.    All right.  Whether the person he was speaking

7  with called him on behalf of Mr. Evans, you did not know,

8  true?

9       A.    Correct.

10       Q.    And you did not ascertain whether that person had

11  called on behalf of Mr. Evans, correct?

12       A.    Correct.

13       Q.    Had you left any officers with Mr. Evans after

14  you left his home to ensure that he wouldn't call Mr. Turpin?

15       A.    No, sir.

16       Q.    Did you ask either Mr. Turpin or Mr. Evans

17  whether they had talked with each other earlier that day

18  before at least you went to their homes respectively?

19       A.    No, I didn't.

20       Q.    Now, when you showed Mr. Evans the photographic

21  array, did you ask him whether he had seen any of the

22  photographs before you showed them to him --

23       A.    No.

24       Q.    -- People's Exhibit 1.  Did you ask Mr. Turpin

25  whether he had ever seen any of the photographs before you

Ortiz - Cross - Greenman                    42

2    showed People's Exhibit 1 to him?

3        A.    No.

4        Q.    Detective Ortiz, on the second page of People's

5    Exhibit 1 in evidence there is a bunch of numbers; is that

6    correct?

7        A.    Yes, sir.

8        Q.    And do those numbers represent numbers that were

9    attributed to the various photographs?

10       A.    Yes, sir, they are.

11       Q.    I'm sorry.  Go ahead.

12       A.    Yes, they are.

13       Q.    All right.  Where did those numbers come from, do

14   you know?

15       A.    From the front of the picture.

16       Q.    This would -- I'm sorry.  Would it be from the

17   front of the picture of something below this?

18       A.    Yes, below that hasn't been exposed.

19       Q.    And was the second page of People's Exhibit 1,

20   was that attached to the first page as it is now when you

21   showed them to Mr. Turpin?

22       A.    Like it is now, no, sir.

23       Q.    When was that attached?

24       A.    I really couldn't tell you.  It was covered on

25   the front.

1

Ortiz - Cross - Greenman                    43

2      Q.      Now, when you first met with Mr. Evans, Detective

3  Lipinczyk was with you; is that correct?

4      A.      Yes, sir.

5      Q.      And you sat him down somewhere in the house and

6  the three of you were all seated together?

7      A.      Actually, he was seated.  We were standing.

8      Q.      All right.  And before you showed him the array,

9  did you have any other conversation with him?

10      A.      Just ask him how he was doing, that's all.

11      Q.      Did you remind him of the fact that he had given

12  you a description of an individual or individuals with

13  respect to the July 20th incident?

14      A.      No, sir.

15      Q.      Okay.  Did you give him any instructions after

16  you sat down with him?

17      A.      Actually, I didn't.  Detective Lipinczyk did.

18      Q.      All right.  Can you tell us what Detective

19  Lipinczyk did with him or said to him?

20      A.      Asked him if he would take the cover off of the

21  photos and see if he could recognize anybody in the photos.

22      Q.      All right.  Now, there is a cover that was on

23  this exhibit, some kind of a cover?

24      A.      Yes, the back of that.

25      Q.      Which would be the second page I showed you

1                    Ortiz - Cross - Greenman                    44

2    before?

3        A.      Correct.

4        Q.      All right.  Can you tell us, Detective, how this

5    was covering the photographs?

6        A.      It was covering with the blank side on the

7    outside.

8        Q.      So that the handwriting would be facing the

9    photographs?

10       A.      Yes, sir.

11       Q.      All right.  Was it affixed to it in any way?  In

12   other words, was it attached?

13       A.      No, sir, it wasn't.

14       Q.      Who was it who gave the photographs to Evans?

15       A.      Detective Lipinczyk did.

16       Q.      And he asked him to take the cover off, at least

17   to remove the cover?

18       A.      Yes.

19       Q.      Was there some reason that you knew of that the

20   cover had not been removed prior to that time?

21       A.      We just don't expose the pictures until the

22   person is sitting down to remove the cover, so they can look

23   at it themselves.

24       Q.      Did you ask him before showing him the

25   photographs whether he felt he'd be able to identify the

Ortiz - Cross - Greenman                    48

Q.    As -- I'm sorry, as of July 22nd?

A.    No, sir.

Q.    You don't have any knowledge one way or the other?

A.    No.

Q.    Does a police officer have access to the photographs upon request at the Buffalo Police Headquarters, that is, the mug shots?

A.    I believe they do.

        THE COURT:   Anything on redirect?

        MR. GREENMAN:   Judge, may I ask one last question, sir?

        THE COURT:   Well, let's be about it.

        MR. GREENMAN:   Did you determine -- at least either before or after you or Detective Lipinczyk told these men that the individual's name was Mario Zanghi, did you ask either one of them whether they knew the name Mario Zanghi?

        THE WITNESS:   No, sir.

        MR. GREENMAN:   That's all I have, Your Honor.

        MR. MARUSAK:   Were you aware of any other office or department within the Buffalo Police Department that was investigating this homicide besides your department?



# Attorney Who May Be Called As a Witness Is Disqualified Due to Conflict of Interest





1282

1  MR. GREENMAN:   Well, that leads us, Your

2  Honor, to the next issue, which I was about to

3  approach the Court, is whether or not we ask the

4  Court to consider whether, in fact, his willingness

5  to speak with me over the past 6, 7 or 8 months

6  amounted to a waiver, certainly, of the 5th

7  Amendment privilege, certainly, when he had the

8  right and the knowledge that he could have counsel

9  present when I spoke with him and even speaking

10  with me after he had counsel present.

11  THE COURT:   People say a lot of things

12  either to each other or even to a lawyer in the

13  preparation of a trial, but it's what's said here

14  under oath before a jury that is dominant.  So

15  whether Mr. Runfola spoke to you truthfully or not,

16  I don't know.  Whether he would speak from the

17  stand truthfully, I don't know, nor do you.

18  MR. GREENMAN:   Your Honor, the other issue

19  that we ask the Court to allow us to address is the

20  issue, if, in fact, Mr. Runfola is allowed to

21  assert the privilege and is not granted immunity,

22  what that does vis-a-vis my conversations with him.

23  I had indicated to Court earlier that Mr. Cambria

24  and I -- Mr. Cambria, is present in the courtroom,

1283

and I had talked over the lunch hour after we

realized what was happening here late this morning.

And I know that Mr. Cambria wanted the permission

at least to address the Court.  And the reason for

him addressing the Court, Your Honor, is by virtue

of the fact of a conflict which then arises by

virtue of my being counsel for Mr. Zanghi and the

fact that I believe we will make application to the

Court to allow me to testify as to what it was that

Mr. Runfola has told me on the numerous occasions

that I've talked with him.

I would indicate, Judge, that -- apologize if

my notes are a little bit tough to read, but I can

certainly decipher them for Mr. Marusak with no

problem, so he wouldn't have the problem in terms

of reading my notes.  I don't believe they're

cryptic.  I think, if he could read everything, he

will see that they are very clear and concise and

tell the whole story, as far as what happened that

evening into the next morning.  So, if the Court

wanted to hear from my office, from my partner or

one of my partners, we would ask the Court to at

least give us the -- in the first instance, the

time to look at the cases.  As Your Honor is aware,

1284

1    this just came up this afternoon for the first

2    time.  We didn't expect it.  I have no reason it

3    was going to happen.  Indeed, I was believing that

4    the opposite would happen, that, in fact, he would

5    remain available, would not seek shelter from the

6    5th Amendment.

7         THE COURT:   What you're proposing or

8    suggesting is that you now get on the stand and

9    testify as to what Runfola told you?

10        MR. GREENMAN:   Yes, Your Honor.

11        THE COURT:   Not under oath, but as an alleged

12   statement against penal interest?

13        MR. GREENMAN:   That's correct, Your Honor.

14        THE COURT:   Well, it's not against his penal

15   interest if he is offering inculpatory testimony

16   against someone other than the defendant and is not

17   offering any exculpatory testimony relative to

18   himself or any inculpatory testimony to himself,

19   right?

20        MR. GREENMAN:   If that's the case, then he

21   shouldn't be allowed to take the 5th in the first

22   place, Your Honor.  That's what our position is,

23   Your Honor.

24        THE COURT:   Well, I don't see that tender as