**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

MARIO ZANGHI, 96-A-5881,

                Petitioner,

        -v-

MICHAEL McGINNIS,

                Respondent.

DECISION AND ORDER
99-CV-6293CJS

## INTRODUCTION

Before the Court is the *pro se* petition of Mario Zanghi ("petitioner") for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (2005). Petitioner is challenging his New York State jury conviction of murder in the second degree, N.Y. Penal Law § 125.25-2 (1996), criminal possession of a weapon in the second degree, N.Y. Penal Law § 265.03 (1996), criminal possession of a weapon in the third degree, N.Y. Penal Law § 265.02 (1996), and reckless endangerment in the first degree, N.Y. Penal Law § 120.25 (1996). For the reasons set forth below, the petition is denied.

## FACTUAL BACKGROUND

Early in the morning of July 20, 1995, petitioner's companion, Robert Runfola ("Runfola"), was ejected from the Pier Restaurant/Nightclub ("Pier") in Buffalo, New York, after an having been involved in an altercation with John Palmer ("Palmer") and David Goodman ("Goodman"). Petitioner, Palmer and Goodman left in their respective cars. Petitioner, with Ralph Amoia Jr. ("Amoia Jr.") driving, and passengers Runfola and Wayne Anderson ("Anderson") left in Amoia Jr.'s white Explorer, while Goodman and Palmer drove

off in Goodman's gray Nissan Stanza. Anderson had not arrived with petitioner, Amoia and Runfola, but was present at the Pier nightclub and left in the Explorer with the other three. (Trial Tr. vol. IX, 1346.)

Soon after the two groups left the Pier, the Explorer encountered a darker-colored vehicle which turned out to be a black Ford Escort occupied by Abdul Bodden ("Bodden")and his two friends, William Turpin, III ("Turpin") and Robert Evans ("Evans"). Bodden and his friends had not been to the Pier that night. As Bodden was being dropped off in a residential neighborhood, the Explorer drove up alongside the Escort. The jury found that petitioner reached out through the window holding a gun, fired and killed Bodden with a shot to the head. Petitioner maintained at trial, and still maintains, that he was not the shooter. As a possible motive for killing Bodden, the People suggested to the jury that petitioner and his friends mistakenly thought that Bodden, Turpin and Evans in the black Escort were actually Palmer and Goodman in their gray Nissan. (Trial Tr. vol. II, 11, 36-39.)

Central to petitioner's claims in this action is his allegation that Herbert Greenman ("Greenman"), his trial defense counsel, had a conflict of interest. In that regard, another attorney, Robert Boreanez ("Boreanez"), who worked at the same firm as Greenman, represented the Amoia family, including Amoia Jr., who was also alleged to have been in the Ford Explorer at the time of the murder. Greenman made petitioner and the County Court aware of the situation during a *Gomberg*[1] hearing. (*Gomberg* Tr., 8.) The prosecutor

---

[1] "The trial judge owes a duty, independent of counsel, to protect the right of an accused to conflict-free, effective representation. Thus, the trial court must conduct a *Gomberg* inquiry, which means that once the trial court has been informed that conflicting interests arguably exist,
(continued...)

informed the Court that he  intended to proceed without Amoia Jr.'s testimony, if he could,

but would use Mr. and Mrs. Amoia as witnesses to establish that Amoia Jr. drove the white

Ford Explorer on the night of the murder. (*Gomberg* Tr., 4.) Petitioner's counsel indicated

that he faced a potential conflict if Amoia Jr. was called to testify, but not if Mr. and Mrs.

Amoia testified. (*Gomberg* Tr., 8.) In court, petitioner declared that, notwithstanding the

potential conflict, he wanted to keep Greenman as his counsel. (*Gomberg* Tr., 8-10.)

## PROCEDURAL HISTORY

Petitioner was convicted after a jury trial on June 21, 1996 of murder in the second

degree, N.Y. Penal Law § 125.25-2 (1996) (count 2) (depraved indifference murder),

criminal possession of a weapon in the second degree, N.Y. Penal Law § 265.03 (1996)

(count 3), criminal possession of a weapon in the third degree, N.Y. Penal Law § 265.02

(1996) (count 4), and reckless endangerment in the first degree, N.Y. Penal Law § 120.25

(1996) (count 5). He was acquitted on count 1 charging intentional murder. Petitioner was

sentenced as a second violent felony offender to 25 years to life in prison on count 1, 7½

to 15 years on count 3, 3½ to 7 years on count 4, and 3 ½ to 7 years on count 5. The

sentences for counts 2, 3 and 4 were ordered to run concurrently with each other, but the

sentence on count 5 was ordered to run consecutively to the others. On December 31,

---

[1](...continued)
it must conduct an inquiry on the record of each defendant whose representation is potentially
conflict-ridden in order to ascertain whether he or she has an awareness of the potential risks
involved in continuing with counsel and has knowingly chosen to do so. This inquiry is vital since
defendants may not always sense when a conflict exists, or clearly understand how it might
undermine effective representation. However, the trial judge is not obligated to make a
comprehensive inquiry into the details of the defense when making his or her conflict of interest
inquiry of the defendant." 33A Carmody-Wait 2d § 172:1860 (2005) (footnotes omitted); *see People
v. Gomberg*, 38 N.Y.2d 307 (1975).

1998, petitioner appealed from his conviction, listing eleven points in his brief to the appellate court, which unanimously affirmed the conviction. *People v. Zanghi*, 256 A.D.2d 1120 (N.Y. App. Div. 1998*).* The New York State Court of Appeals subsequently denied his request for leave to appeal. *People v. Zanghi*, 93 N.Y.2d 881 (1999). On July 9, 1999, petitioner filed a petition for a writ of habeas corpus in this Court containing eleven points. These are all the same eleven points that petitioner raised on direct appeal in the State courts.

Subsequent to filing his petition in this Court, on October 2, 2001, petitioner filed in the Erie County Court a New York Criminal Procedure Law section 440.10 motion ("440 motion"). In that application, petitioner alleged "improper and prejudicial conduct not appearing in the record." (*Id.* at 2.) Essentially, the motion was an expansion of petitioner's sixth point in his brief on direct appeal, pertaining to his claim of ineffective assistance of trial counsel. More specifically, he claimed that "[t]he full scope of [Boreanez's] representation [of the Amoia family members] was never revealed to me." (Zanghi Aff. (Aug. 29, 2001) ¶ 22.) In the 440 motion, petitioner claimed that he thought Boreanez was only "advising" the Amoia family, not representing them. (*Id.* ¶ 13.) Petitioner further claimed that Greenman did not call Amoia Jr. as a witness, nor did he effectively cross examine Amoia Jr.'s mother, Wendy, because Boreanez was actually representing Amoia. (*Id.* ¶ 26.) Further, plaintiff alleged that "had my defense not been laboring under this serious conflict of interest, the outcome of this matter may have been different." (*Id.* ¶ 23.) In response to the motion, the People stated, "petitioner knowingly and voluntarily chose to continue to be represented by counsel of his choice after being" advised of the potential conflict. (Answer ¶ 23.) On November 29, 2001, Erie County Court denied petitioner's

4

section 440.10 motion on procedural grounds. *People v. Zhangi*, No. 95-1755-001 (N.Y. Cty. Ct. Nov. 29, 2001). In the order denying the motion, the County Court judge stated, "[t]he same issue (ineffective assistance of counsel) was raised by defendant on his direct appeal from the judgment and it was expressly rejected on the merits. Accordingly, the [petitioner]'s motion to vacate the judgment should be denied without a hearing (CPL § 440.10(2)(a))." Decision and Order, *People v. Zanghi*, No. 95-1755 (N.Y. Cty. Ct. Nov. 29, 2001), at 2. The language in section 440.10(2)(a) is as follows: "[t]he court must deny a motion to vacate judgment when ... [t]he ground or issue raised upon the motion was previously determined on the merits upon an appeal from judgment[.]" The County Court based its decision to deny the motion solely on this procedural rule and did not discuss the merits of petitioner's claim.

On December 14, 2001, petitioner sought permission to appeal the denial of his section 440.10 motion. The Appellate Division denied leave to appeal on July 9, 2002. On December 24, 2002, petitioner amended his petition for a writ of habeas corpus. The amended petition includes an unmodified copy of the original eleven points previously included, and adds the denied section 440 motion. (*See* Amended Pet.)

## AMENDED § 2254 PETITION

Petitioner's amended petition consists of the following twelve claims:

1.     The court's failure to determine the prejudicial effect of newspaper articles published during trial and to have granted a mistrial deprived petitioner of his constitutional right to due process or to an impartial jury.

2.     The trial court's denial of a challenge for cause violated petitioner's constitutional rights to a fair and impartial jury.

3.      The trial court's failure to direct the prosecutor to grant immunity to defense witnesses and to deliver appropriate instructions to the jury violated petitioner's rights to due process.

4.      The hearing court's error in denying the application of the defense to compel the complainants' testimony at the *Wade* hearing violated petitioner's rights to due process and compulsory process.

5.      Admission of Pier nightclub evidence was erroneous and deprived petitioner of a fair trial.

6.      Petitioner was denied effective assistance of counsel.

7.      The trial court's failure to have conducted a lineup or a *Wade* hearing with respect to a prosecution witness deprived petitioner of his constitutional rights to due process.

8.      The trial court's refusal to receive into evidence a statement against penal interest deprived plaintiff of his constitutional rights to due process, and a fair trial.

9.      The verdict is against the weight of evidence.

10.     The evidence is insufficient to sustain petitioner's three convictions.

11.     Petitioner's sentences are unduly harsh and excessive.

12.     Ineffective assistance of counsel on the grounds raised in petitioner's C.P.L. Section 441.10 motion.

(*See* Amended Pet. at 11-12.)

## DISCUSSION

### Standard of Review

In reviewing a state prisoner's habeas corpus petition pursuant to 28 U.S.C. § 2254, a Federal district court makes an independent determination as to whether the petitioner is in custody in violation of his rights under the Constitution or any laws and treaties of the United States. *Coleman v. Thompson*, 501 U.S. 722, 730 (1991). Under § 2254, Federal court does not function as an appellate court to review matters within the jurisdiction of the

6

State, or to review rulings and decisions of State trial and appellate courts. Rather, a Federal court only determines whether the proceedings in State court amount to a violation of Federal constitutional rights. *Id*. Federal review of a state court conviction is limited to errors that are of Federal constitutional magnitude and which deny a criminal defendant the right to a fundamentally fair trial. *Cupp v. Naughton*, 414 U.S. 141, 144 (1973).

When a habeas claim has been adjudicated in state court, the habeas court may not grant relief unless the state court decision was:

> contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> . . .
>
> based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1) and (2).

The phrase, "clearly established Federal law," "refers to the holdings, as opposed to the dicta of [the U.S. Supreme] Court's decisions as of the time of the relevant state-court decisions." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A State court decision is contrary to clearly established Federal law if the State court "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" that of the Supreme Court. *Williams*, 529 U.S. at 405.

A State court decision is an "unreasonable application" of Supreme Court precedent if it,

> Identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts ... [or] unreasonably extends a legal

principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Id.* at 407. This standard applies even if the State court decision was a summary affirmance of the conviction that did not explicitly reject the Federal claim, as long as the decision necessarily determined the claim. *Sellan v. Kuhlman*, 261 F.3d 303 (2d Cir. 2001).

***Exhaustion***

Before examining the merits of petitioner's claims, it is necessary to consider whether petitioner exhausted State court remedies. Generally, a Federal court will not entertain a habeas corpus petition from a State prisoner unless the prisoner has exhausted state court remedies. *Picard v. Connor*, 404 U.S. 270, 275 (1971). The habeas statute provides that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). A petitioner must exhaust his judicial remedies with regard to each claim that he seeks to assert in a federal habeas proceeding. *Id.*

Federal courts will not consider constitutional challenges that have not been "fairly presented" to the State courts. *Jones v. Keane*, 329 F.3d 290, 294 (2d Cir. 2003) (citations omitted). "A petitioner has 'fairly presented' his claim only if he has 'informed the state court of both the factual and the legal premises of the claim he asserts in federal court.'" *Id*. at 294-95 (citing *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir.1997)). Moreover, each claim raised in the State court "must be the 'substantial equivalent' of the claim raised in the federal habeas petition." *Id*. at 295 (citations omitted).

8

***Procedural Default***

Ancillary to the concept of exhaustion is the doctrine of procedural default. A petitioner who has procedurally defaulted on a claim thereby makes it unreviewable by Federal courts. The Supreme Court explained the intertwined concepts of exhaustion and procedural default, stating:

> We therefore ask in federal habeas cases not only whether an applicant has exhausted his state remedies; we also ask how he has done so. This second inquiry forms the basis for our procedural default doctrine: A habeas petitioner who has concededly exhausted his state remedies must also have properly done so by giving the State a fair opportunity to pass upon his claims. When a prisoner has deprived the State courts of such an opportunity, he has procedurally defaulted his claims and is ineligible for federal habeas relief save a showing of cause and prejudice, or a fundamental miscarriage of justice.

*O'Sullivan v. Boerckel*, 526 U.S. 838, 854 (1999) (citations and internal quotations omitted); *see Campino v. United States*, 968 F.2d 187, 190 (2d Cir. 1992) ("failure to raise a constitutional issue on appeal is itself a procedural default, thereby implicating the cause and prejudice test."). Exhaustion is the depletion of State court remedies and procedural default is the theory put in place to safeguard that such depletion was properly obtained. A habeas petitioner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established review process." *O'Sullivan*, 526 U.S. at 845 (1999). "A complete round requires that the petitioner must present his or her claim to the highest court of the state." *Galdamez v. Keane* 394 F.3d 68, 73 (2d Cir. 2005).

If a claim is found to have been procedurally defaulted, the Court must apply the cause and prejudice test. To meet the requirements of this test, a petitioner must show a cause for his procedural default and resulting prejudice to his rights. *Wainwright v. Sykes*,

433 U.S. 72, 84 (1977). Cause must be "something external to the petitioner, something that cannot be fairly attributed to him." *Coleman*, 501 U.S. at 753. "Objective factors that constitute cause include interference by officials that makes compliance with the State's procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to counsel." *McCleskey v. Zant*, 499 U.S. 467, 494 (1991). The prejudice prong requires that the petitioner show not just that the errors "created a possibility of prejudice, but that they worked to his actual and substantial disadvantage." *United States v. Frady*, 456 U.S. 152, 170 (1982).

There is an exception to the cause and prejudice test. If the petitioner fails to demonstrate cause, courts may still consider newly raised claims where "failure to consider the claims will result in a fundamental miscarriage of justice." *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992). A fundamental miscarriage of justice occurs in those "extraordinary circumstances" when a constitutional violation probably has caused the conviction of one who is "actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

### *Independent and Adequate State Grounds*

Federal courts will not consider an "issue of federal law on direct review from a judgment of a State court if that judgment rests on a State-law ground that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the court's decision." *Harris v. Reed*, 489 U.S. 255, 260 (1989). The cause and prejudice test also applies to the adequate and independent State ground doctrine. *Id.* at 262. It is well established that the adequate and independent State ground doctrine applies to federal

habeas petitioner. *Wainwright v. Sykes*, 433 U.S. 72, 81. In *Harris*, the Supreme Court discussed the adequate and independent analysis as it applies to procedural State law.

> "[T]he mere fact that a federal claimant failed to abide by a state procedural rule does not, in and of itself, prevent this Court from reaching the federal claim: 'the state court must actually have relied on the procedural bar as an independent basis for its disposition of the case.'"

*Harris,* 489 U.S. at 261-62.

### Analysis of Exhaustion of Petitioner's Claims

The Court must first decide whether petitioner has exhausted all twelve claims raised in his amended petition, then determine if any issues have been procedurally defaulted. If the claims have been procedurally defaulted, the Court must next apply the cause and prejudice test.

### Original Eleven Claims

In the instant case, the claims presented in the original petition are the exact same ones raised on direct appeal. However, points nine and eleven were omitted in petitioner's leave application to the New York State Court of Appeals. These two points were reintroduced by petitioner on his habeas petition. Petitioner no longer can raise these two claims on direct appeal and, therefore, no longer has any available State court remedy. However, since points nine and eleven have never been presented to the highest State court, they are procedurally defaulted and are unreviewable by the Court absent a showing of cause and prejudice. Petitioner was clearly aware of points nine and eleven, since he raised them in his direct appeal to the Appellate Division. Petitioner has offered no evidence for why he chose to abandon these issues in his leave application. Therefore, no

cause has been established and these issues are unreviewable by the Court under 28 U.S.C. § 2254.

***Section 440.10 Motion Claim***

The County Court based its decision to deny the section 440.10 motion solely on procedural rule in section 440.10(2)(a) and did not discuss the merits. In the context of the "adequate and independent state ground" doctrine, the County Court relied independently on State law and the section 440.10 portion of the amended complaint is, therefore, unreviewable by the Court.

Petitioner raised the conflict of interest issue on direct appeal and in the section 440.10 motion. Even though there were more facts asserted in the section 440.10 motion, the County Court's decision was made on the procedural basis that the issue had already been decided on direct appeal. As has been stated earlier, it is not the role of the Federal court to act as an appellate court to the State. *Coleman*, 501 U.S. at 730. This Court can consider petitioner's claims raised in the section 440.10 motion only if petitioner showed cause and prejudice for his failure to raise those same facts in his direct appeal. Petitioner does offer some showing of cause and prejudice in pages eleven and twelve of his "Supplemental Amended Petition."

On the first page of this submission, petitioner wrote, "I ask you to please consider these documents a supplemental pleading to be considered along with my original petition that addresses my claim of ineffective assistance of counsel as ordered in the decision and order dated 10/11/02." (Supp. Am. Pet. at 1.) Petitioner states, "the issues that he is now advancing were raised in his CPL 440.10 Motion." (*Id.* at 11-12.) Since the section 440.10 decision is unreviewable as a result of the adequate and independent State ground

12

doctrine, the Court is not permitted to review the same issues simply because they are presented in another document, absent a showing of cause and prejudice. As to cause and prejudice, petitioner, in his supplemental pleading, claims that, after obtaining and reviewing the *Gomberg* hearing transcript, he realized that Boreanez was not just "advising" Amoia Jr., but rather that Boreanez was "representing" him. (*Id.* at 12-13.) Petitioner claims that, due to this confusion, he was unable to "knowingly, intelligently, and voluntarily" waive his right to conflict-free counsel, and, therefore, his Sixth Amendment right to effective assistance of counsel was thereby violated. (*Id.* at 13.)

Petitioner maintains  that the cause for his delay in raising this matter is that he did not have any knowledge of the transcript until five years after his conviction. The Court finds that this is insufficient to prove cause. The sole purpose of the *Gomberg*  hearing was to assess any conflict and ensure that, if petitioner chose to continue with Greenman, he did it knowingly. Petitioner was not only present at the hearing, but was also an active participant. (*Gomberg* Tr., 6-7.) Moreover, on direct appeal, when petitioner initially raised his ineffective assistance of counsel claim, he discussed the *Gomberg* hearing. (Br. for Appellant at 40.) Therefore, it is clear that petitioner was well aware of the hearing and its subject matter. In order for the Court to be able to review the specific issues raised in his supplemental amended petition, petitioner needs to show that some cause, apart from his own conduct, prevented him from presenting these issues on direct appeal and that this cause resulted in actual prejudice against him. *Coleman*, 501 U.S. at 753. Petitioner has offered no evidence with respect to why the *Gomberg* transcript was unavailable to him for five years, nor does he explain why the transcript provided any more information than that gained from his actual participation in the hearing. Without cause, the Court is barred from

13

reviewing these issues as they have already been decided on adequate and independent State grounds.

It is important to clarify that petitioner did allege ineffective assistance of counsel in his direct appeal. (Br. for Appellant at 40-42.) However, the details petitioner offered to substantiate that claim related only to the allegation that, due to Greenman's conflict of interest, Greenman decided not to call Amoia Jr. as a witness. (*Id.*) Therefore, all other issues  regarding ineffective assistance of counsel raised in petitioner's section 440.10 motion are barred and cannot, therefore, be reviewed by the Court.

### *Analysis of the Merits of Petitioner's Nine Remaining Claims*[2]

Claim One

The day after petitioner's first day of testimony, June 20, 1996, two newspaper articles were published about the case in *The Buffalo News*. Petitioner brought these to the attention of the County Court and requested that the court poll the jurors to see if they had read the articles and, also, to admonish the jury not to read the paper or expose themselves to the media. The prosecution had no objection to the court's admonishing the jury. The court reviewed the articles and stated,

> [w]ell, the Esmond [first] article I find to be nothing more than a sympathetic view of a victim of a crime and there is nothing contained within in that I feel is in any prejudicial to the person who stands accused of that crime. There is no references that are of negative impact upon the accused. And it's not surprising that the family of the victim of a senseless shooting would be extended the sympathy of the community for that consequence.

> As to the other [second] article, I agree, that there [are] references in there

---

[2]As indicated above, petitioner's ninth claim, in which he contends that his verdict was against the weight of evidence, and his eleventh claim, in which he contends that the sentences he received were harsh and excessive, have been procedurally defaulted.

> that have been excluded by Court ruling and I have, however, told this jury repeatedly that they are to avoid all reference to the press in relation to this case on the grounds that the information being received in this courtroom is far more relevant than anything that they could read in a newspaper about it.
>
> The particular article in question, basically, details that which they have already heard here already court from the defendant's testimony, with the exception of that one limited paragraph. And I will definitely admonish them that they are to have no reference to any newspaper accounts today, tomorrow, until this case is over. And that I would purposely direct them to refrain from any reading of [*The Buffalo News*] … until this case is over.

(Trial Tr. vol. X, 1501-02.) Trial defense counsel made no comment, and raised no objection, to the County Court's decision to admonish the jury, without questioning the jurors first. Later, the court admonished the jury, stating,

> there has been of reference in today's paper, at least one, perhaps, 2 articles relative to this trial, and I don't want this trial decided on newspaper accounts, whether by column or by news reference or news article. As you know and I must charge you, that sympathy is not a factor in this case, nor is prejudice and, that therefore, those are not factors for you to consider. With respect to representations of that which has transpired here in court that are reflected in the newspaper, those are at best secondary and third sources relative to events and, therefore, they are not to be considered or be part of your judgment. Therefore, I am specifically ordering each of you to avoid *The Buffalo News* with respect to these two articles. So would you tell those at home, I don't want to hear about them, I don't want to read them, I'm going to decide this case based upon what transpires here in this courtroom and I don't want to reference them and I don't want you to reference them.

(Trial Tr. vol. X, 1576-77.)

Notwithstanding the County Court's admonishment to the jury, petitioner claimed on direct appeal that the court's refusal to specifically ask jurors if they had read the articles "improperly deprived" him of his right to an impartial jury (Br. for Appellant at 13-19.) The Appellate Division considered this claim unpreserved, because petitioner "failed to object to the jury charge concerning those articles." *Zanghi*, 256 A.D.2d at 1120.

15

The Second Circuit has held that a defendant's failure to object to potentially prejudicial information in a timely fashion "as required by the New York state contemporaneous objection rules constitutes a procedural default barring habeas review under *Wainwright v. Sykes* unless [the defendant] can demonstrate cause and actual prejudice." *Cuevas v. Henderson*, 801 F.2d 586, 589 (2d Cir. 1986). Therefore, the Court can only address point one if petitioner has shown cause and prejudice. However, petitioner has not offered any claim of cause and prejudice to explain the procedural default. Accordingly, the law requires that the Court deny relief based on this claim.

Claim Two

During voir dire, Mr. Greenman asked one venireman, "[a] couple [of] jurors have indicated that they have some problems … with feeling that the system is biased one way or the other way, too lenient or too harsh…. Mr. Kurtzman, you have some feeling, I think, that you have indicated to some extent. Anything other than what we've heard before?" (Jury Selection Tr. vol. I, 93-94.) The venireman responded, "I just think that things are slanted for the defendant somewhat and victims get the shorter end of the stick," (Jury Selection Tr., vol. I, 94), but later agreed with defense counsel that he "would listen to whatever instructions I'm supposed to" (*Id*.). Mr. Greenman challenged him for cause, and the County Court denied the challenge. (Jury Selection Tr. vol. I, 103-04.) Petitioner claims in his habeas application that the County Court's denial of his counsel's challenge for cause deprived him of his Federal and State "constitutional and statutory rights to be tried by a fair and impartial jury…." (Pet., Questions Presented, at 1.)

The Supreme Court of the United States, in *Patton v. Yount*, 467 U.S. 1025 (1984), addressed the proper standard of review in "a federal habeas corpus case in which the

16

partiality of an individual juror is placed in issue. That question is not one of mixed law and fact. Rather it is plainly one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Id*. at 1036. Further, the Supreme Court held that a habeas court must apply the statutory presumption of correctness to the trial court's finding in this regard. *Id*. at 1038. The statutory presumption, referred to by the Supreme Court, states, "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Finally, the Supreme Court also noted,

> There are, of course, factual and legal questions to be considered in deciding whether a juror is qualified. The constitutional standard that a juror is impartial only if he can lay aside his opinion and render a verdict based on the evidence presented in court is a question of federal law. [W]hether a juror can in fact do that is a determination to which habeas courts owe special deference, *see Rushen v. Spain*, 464 U.S. 114, 120 (1983); *Marshall v. Lonberger*, 459 U.S. 422, 431-32 (1983).

*Patton,* 467 U.S. at 1037 n.12.

The Jury Selection transcript reflects that the juror was honest with his personal beliefs, yet willing to be impartial as the judge instructed. (Jury Selection Tr., vol. I, 93-94.) Applying the statutory presumption in 28 U.S.C. § 2254(e)(1), the Court determines that petitioner has not met his burden of showing by clear and convincing evidence that the County Court's decision to deny his challenge for cause deprived him of a fair and impartial juror. Accordingly, the Court denies petitioner's request for relief on this ground.

Claim Three

The People presented evidence that petitioner was in the front seat of Amoia Jr.'s Ford Explorer and from that seat he killed Bodden. (Trial Tr. vol. II, 102-06, 111; vol. III, 309-13.) Petitioner claims that he was in the back seat with Runfola and that Anderson was the person in the front seat who did the shooting. (Trial Tr. vol. IX, 1376-77, 1383.) Runfola declared in court that he intended to invoke his Fifth Amendment privilege. (Trial Tr. vol. VIII, 1288-90.) Amoia Jr. also made known, through his attorney, that he intended to invoke his Fifth Amendment privilege. (Trial Tr. vol. IX, 1311.) Petitioner requested that the County Court direct the prosecutor to confer immunity on both Amoia Jr. and Runfola, but the court denied the request (*Id*. at 1311-12.)

Petitioner's third point consists of two parts. The first issue is whether petitioner's constitutional rights were violated because the County Court refused to direct the prosecution to grant the defense's witnesses immunity. The second issue raised under petitioner's point three, is whether the County Court violated petitioner's rights when it denied his request to give the jury a missing witness charge.

On the first point, the Second Circuit has held that, "[o]nly when a prosecutor has abused the government's ability to grant immunity by using it in a discriminatory fashion for the purpose of gaining a tactical advantage does due process require a grant of immunity for a defense witness." *Blissett v. Lefevre*, 924 F.2d 434, 442 (2d Cir. 1991). The record of petitioner's trial does not reveal any such discriminatory use of immunity by the prosecutor. Accordingly, the prosecution had no duty to grant immunity to Amoia Jr. and Runfola, and the County Court's refusal to order the prosecutor to grant immunity was not constitutionally required.

18

Turning to his second point, petitioner claimed that the defense did all that it could to call the witnesses (Amoia Jr. and Runfola) and that the County Court should have explained this to the jury. (Trial Tr. vol. X, 1595-1600.) The requested instruction read as follows:

> During this trial the defense subpoenaed Robert Runfola. Other testimony in this case demonstrates Robert Runfola was an occupant of the Explorer before, during and after the discharge of a weapon which caused the death of Abdul Bodden. In response to [a] defense subpoena, Robert Runfola invoked a right not to testify. Additionally, the defense wished to call Ralph Amoia as a witness. The defense and the prosecution agreed, if Mr. Amoia were called as a witness for the defense, he would invoked his rights not to testify. I, as a trial Judge, have ruled Mr. Runfola['s] and Mr. Amoia's invocation of the right is proper. You are not to speculate upon what the nature of that right is and you are not to speculate about what testimony Mr. Runfola or Mr. Amoia would have given having not invoked that right. I convey this information to you so that you now know that the defense used all compulsory means available to obtain the testimony of Robert Runfola and Ralph Amoia at this trial.

(Trial Tr. vol. X, 1595.) The County Court denied petitioner's request to read that charge to the jury. (*Id*. at 1596-98.) The County Court did charge that, "a jury during its deliberations must never indulge in speculation or guesswork. If you do speculate on matters that are not here before you were not in evidence, you'll find yourself bogged down in discussions that are not really relevant to your mission today." (Trial Tr. vol. XI, 1717.)

Since the County Court did direct the jury not to speculate, the issue remaining before this Court is whether the County Court's failure to offer the missing witness charge, proffered by petitioner's defense counsel, deprived him of his right to a fair trail. Whether to give a missing witness charge rests "in the sound discretion of the trial court." *United States v. Miranda*, 526 F.2d 1319, 1330-31 (2d Cir. 1975). Further, "a prosecutor's failure to immunize a witness does not, categorically, give rise to an inference that the witness's

testimony would be unfavorable to the government." *U.S. v. Myerson*, 18 F.3d 153, 159 (2d Cir. 1994).

In another case, the Second Circuit elaborated on when a missing witness charge would be proper:

> When a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction and fails to produce such witnesses, the jury may infer that the testimony, if produced, would be unfavorable to that party. However, when a witness is equally available to both sides, the failure to produce is open to an inference against both parties.

*United States v. Torres*, 845 F.2d 1165, 1169 (2d Cir. 1988) (Citations and internal quotations omitted). In the contrary situation, "[a]n instruction need not be given where a witness is equally *unavailable* to both sides. *Cf. United States v. Myerson*, 18 F.3d 153, 158 (2d Cir.1994) (noting that other circuits have held that a witness invoking Fifth Amendment privilege is unavailable to both sides, so 'no missing witness charge need be given')." *U.S. v. Prescott*, 125 F.3d 845 (2nd Cir. 1997) (emphasis added).

Clearly both Amoia Jr. and Runfola were unavailable to both parties. Thus, the County Court's decision to deny the missing witness charge was well within its discretion and was not contrary to established Federal law.

Claim Four

_____Detective Andres Ortiz ("Ortiz"), of the Buffalo Police Department, assembled a photo array. (*Huntley*[3] Hr'g Tr. 6-8.) On July 22, 1995, Turpin and Evans each viewed the array and individually identified petitioner as the man who had shot Bodden. (*Id.* 11-12,15-16.)

The next day, *The Buffalo News* published an article with a picture of petitioner. Ortiz stated that the picture in the paper was the same as one of the pictures in the photo array. (*Id.* at 32.) Ortiz denied having provided petitioner's photo to the media. (*Id.* at 32-33.) The County Court refused to allow petitioner to call Turpin and Evans at the *Huntle*y hearing, reasoning that since there had been no demonstration of impermissible police conduct, their testimony was not required.[4] (*Id.* at 96-97.) Petitioner claims that the County Court's refusal to allow Turpin and Evans to be called as witnesses at the *Huntley* hearing violated his due process rights. (Pet., Questions Presented ¶ 4.)

The resolution of this issue turns on a consideration of procedural default, as discussed in point one, above. At the close of the *Huntley* hearing, plaintiff's counsel stated, "I believe, Your Honor, that there have been questions which have been raised here to the extent that I believe that those witnesses should be called by myself or [the prosecutor] and I'd like to have them available." (*Huntley* Hr'g Tr. at 97-97.) Respondent,

---

[3]In New York, a *Huntley* hearing is held to determine the admissibility of statements made by a criminal defendant. *See People v. Huntley*, 15 N.Y.2d 72 (1965). Though this was, in fact, a *Wade* hearing, *see United States v. Wade*, 388 U.S. 218 (1967), to test the admissibility of a pretrial identification, the court reporter labeled the transcript of the hearing "Huntley Hearing."

[4]The County Court relied on the analysis set forth in *People v. Chipp*, 75 N.Y.2d 327, 335-36 (1990).

in his memorandum of law submitted November 5, 1999, asserted that counsel's statement was an insufficient objection to preserve the issue on appeal. (Resp't Mem. of Law, Nov. 5, 1999, at 10-12.)  In that regard, on direct appeal, the Appellate Division considered this issue unpreserved and, therefore, refused to decide it. *Zanghi*, 256 A.D.2d at 1121.

Even though petitioner raises his suspicion of police misconduct with respect to release of his mug shot to the press, under the law, the Court cannot review the issue absent a showing of cause and prejudice. The Second Circuit has been very clear on the topic. *Cuevas*, 801 F.2d at 589; *Rosenfeld v. Dunham*, 820 F.2d 52, 54 (2d Cir. 1987). Here, petitioner has offered no claims of cause to excuse his failure to raise a proper objection at the time of the hearing.

In any event, the Court notes that all of petitioner's claims of misconduct offer no plausible rebuttal to the two eyewitness accounts. (Trial Tr. vol. II, 106-09; vol. III, 312-15.) Turpin and Evans were within feet of the shooter as he leaned out of the white Ford Explorer to shoot at them. (*Id.*) Moreover, petitioner had the opportunity, during trial, to question the witnesses about the newspaper articles and any possible influence that the articles might have had on their identifications. Under the circumstances present here, the photo array did not "give rise to a substantial likelihood of irreparable misidentification" and the County Court's decision, therefore, was not contrary to Federal law. *See Manson v. Brathwaite,* 432 U.S. 98, 107 (1977).

Claim Five

_____Petitioner contends that the County Court's admission of other crime evidence, specifically his altercation at the Pier nightclub, deprived him of a fundamentally fair trial

in violation of the Due Process Clause of the Fourteenth Amendment. The Court disagrees.

Based on the testimony of Palmer and Goodman, the prosecution established that petitioner had been in an altercation at the Pier nightclub earlier in the same evening as the shooting. (Trial Tr. vol. II, 106-07; vol. III, 312-13.[5]) Petitioner claims that the County Court's admission of Palmer's and Goodman's testimony "was irrelevant and its prejudicial impact far outweighed any conceivable probative value," in violation of his Fifth and Fourteenth Amendment rights. (Pet., Questions Presented ¶ 5.) In response to petitioner's objections, the County Court decided "to allow for [Palmer's and Goodman's] attendance and for their testimony ... on the grounds that [it] believe[s] that it may have relevance should the jury feel it is connected ... and it will be for them to determine its relevance and probity." (Trial Tr. vol. VI, 942.)

Habeas courts considering evidentiary error claims must circumspectly distinguish between mere errors of state law and those of constitutional magnitude. As with all of petitioner's claims, the Court must evaluate the County Court's decision to allow the Pier evidence using the deferential standard of § 2254(d). A federal court must not issue a writ unless the State court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d); *see Jones v. Stinson*, 229 F.3d 112, 120 (2d Cir. 2000). More specifically, "[i]n order to prevail on a claim that an evidentiary error deprived the defendant of due process under the Fourteenth Amendment he must show that the

---

[5]The People also presented evidence of this altercation at the Pier through the eyewitness testimony of security guards, Ronald Wainwright and Thomas Burney. (Tr. 263, 427.)

error was so pervasive as to have denied him a fundamentally fair trial." *Collins v. Scully*, 755 F.2d 16, 18 (2d Cir. 1985); *see Jones*, 229 F.3d at 120; *Rosario v. Kuhlman*, 839 F.2d 918, 924 (2d Cir.1988); *see also Taylor v. Curry* 708 F.2d 886, 891 (2d Cir. 1983) ("Erroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus. Rather, the writ would issue only where petitioner can show that the error deprived her of a fundamentally fair trial.")

The United States Supreme Court decided a case with a very similar issue. *Estelle v. McGuire*, 502 U.S. 62 (1991) (reversing appellate court's reversal of conviction, holding that a federal court deciding a habeas corpus petition cannot grant the writ based on the admission of certain evidence, an alleged error of State w). *Estelle* held that the admission of the prior act evidence plainly was not contrary to established Supreme Court precedent when relevant to the crime charged. *Id*. at 70.

The People asserted that petitioner's mistaking Turpin's black Escort for Palmer's gray Nissan was the reason for the shooting. (Trial Tr. vol. I, 38)[6] The encounter with Palmer and Goodman at the Pier was the basis for the alleged misidentification. The continuation of the conflict at the Pier, the People assert, was petitioner's motive, and the admitted evidence was, consequently, probative of such motive. The Court agrees and further finds that the admission of the Pier evidence served to complete and contextualize a narrative of events. Additionally, petitioner admits that the shooter was sitting in the front seat. (Trial Tr. vol. IX, 1348, 1376-77) and Palmer's testimony showed that petitioner was

---

[6]At trial the prosecution stated, "[Palmer's car] looked exactly like Ted Turpin's car . . . the only plausible explanation for the senseless murder was that this defendant wanted to continue the confrontation at the Pier." (Trial Tr. vol. I, 38.)

seated in the front seat of the white Explorer, a fact that petitioner himself denied. (Trial Tr. vol. VI, 963; Trial Tr. vol. IX, 1348).[7] Evidence that is probative of motive, completes the narrative, and helps to resolve a disputed crucial fact, is unmistakably relevant. Its admission is, therefore, in accord not only with the Constitution, but with both State and Federal evidentiary rules.[8]

Petitioner has not demonstrated that the admission of testimony concerning the altercation at the Pier deprived him of a fundamentally fair trial in violation of the Due Process Clause of the Fourteenth Amendment. Accordingly, his petition for a writ of habeas corpus on that ground must be denied.

Claim Six

Petitioner's allegation of ineffective assistance of counsel is based upon his allegation that his counsel, Greenman, had a conflict of interest. (Br. for Appellant at 40-

---

[7]Petitioner did testify that he was in the front seat of the Explorer when he and his two companions drove to The Third Room bar (Trial Tr. vol. IX, 1325), and when they drove to The Pier nightclub (Trial Tr. vol. IX, 1331).

[8]Comparable to federal law, New York law allows for admission of evidence regarding prior bad acts and/or uncharged crimes where it is relevant to an issue other than a defendant's propensity to commit the act or crime. *See People v. Till*, 87 N.Y.2d 835 (1995). Such evidence may, for example, be admitted when probative of a defendant's motive or intent, or to complete a narrative. *See People v. Gines*, 36 N.Y.2d 932 (1975); *People v. Santiago*, 295 A.D.2d 214 (N.Y. App. Div., 1st Dep't, 2002); *People v. Mendez*, 165 A.D.2d 751, 752 (N.Y. App. Div., 1st Dep't, 1990).
Federal Rule of Evidence 404(b) governs admission of evidence of other crimes, wrongs or bad acts in federal trial courts. Under this Rule, such evidence is not admissible to show a propensity to commit the crime charged, but is admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of accident or mistake." Fed. R. Evid. 404(b); *see also United States v. Inserra*, 34 F.3d 83, 89 (2d. Cir. 1994) (stating that evidence of uncharged bad acts and/or crimes is admissible "for any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test"). Evidence of bad acts is admissible under 404(b), for example, if it is "necessary to complete the story of the crime on trial." *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997).

42.) Petitioner asserts that the County Court's inquiry into Greenman's conflict was inadequate, and that therefore his  waiver of the conflict ineffective. (*Id.* at 40-41.) Petitioner claims that, as a result of the conflict, Greenman did not call Amoia Jr. as a witness. (*Id.*) The Court finds that this claim is wholly without merit.

At the very outset of the *Gomberg* hearing, the prosecution alerted the County Court to that fact that Boreanaz "represents Ralph Amoia." (*Gomberg* Hr'g Tr. at 2.) Following is an excerpt of a key interaction between the County Court and petitioner at the hearing.

> THE COURT: Well, Mr. Zanghi, you, of course, are aware by these statements of the fact that Mr. Boreanaz is employed or works in association with the same firm as Mr. Greenman. You're aware of that fact?
>
> PETITIONER: Yes, I am.
>
> THE COURT: You're now made aware of the fact that he, apparently, had been advising, as counsel, one or other of these Amoias, who may be witnesses in your prosecution. Do you understand this?
>
> PETITIONER: Yes, I do.

It is clear from the record that petitioner was made aware of the fact that Boreanaz was an attorney in Greenman's firm and that he was advising Amoia Jr. regarding legal matters. The Court concludes that petitioner had an adequate knowledge of the conflict to properly waive his right to conflict-free counsel. *See Williams v. Meachum*, 948 F.2d 863, 867 (2d Cir. 1991) ("In reviewing a defendant's waiver, however, we are ultimately concerned less with the exact words used by the trial judge than with whether the facts and circumstances of the case indicate that the defendant fully appreciated his situation and made a properly informed decision.").

Further, petitioner asserts that Greenman was ineffective, since he failed to call Amoia Jr. as a witness as he had tried to do with Runfola. However, Amoia Jr., had made

26

it clear that he would invoke his Fifth Amendment right against self-incrimination. (Trial Tr. vol. IX, 1311-12). On the other hand, Greenman called Runfola to trial under the assumption that he would possibly testify. (Trial Tr. vol. VIII, 1235-90.) As it turned out, Runfola invoked his Fifth Amendment right and was, therefore, never called as a witness. (*Id*. at 1288.) Petitioner argues that there would have been some advantage to bringing Amoia Jr., into court in the absence of the jury, as had been done with Runfola. (Br. for Appellant at 41-42.) However, the only reason that Runfola was brought to court was because there was some confusion as to whether he would testify. (Trial Tr. vol. VII, 1286.) The County Court stated, "We'll see you [Greenman] tomorrow at 11:30 with Mr. Runfola to see whether or not his position remains unchanged or not." (*Id*.) The next day, after examination by the County Court,  Runfola chose not to testify and was never seen by the jury. (Trial Tr. vol. VIII, 1288.). In examining Runfola, Here, the County Court judge established that if Runfola was called, he would have been questioned about the murder and the fight that preceeded the murder at the Pier night club (Trial Tr. vol. VII, 1236), and therefore could validly claim his Fifth Amendment privilege. *See Hoffman v. United States*, 341 U.S. 479, 486 (1951).  (*Id*. at 1251-55.) Based on the court's examination of Runfola and its ruling denying him immunity, counsel stipulated, after discussion with Amoia Jr.'s counsel, that he, also, would invoke his Fifth Amendment privilege and not testify concerning the murder or fight prior to the murder. (Trial Tr. vol. IX, 1311.)  There was nothing remotely unreasonable about Greenman's decision to not call a witness who already intended to invoke the Fifth Amendment.

In any event, even assuming that petitioner's waiver was inadequate and that an actual conflict existed as to Greenman's failure to call Amoia Jr., petitioner's ineffective

assistance of counsel claim is without merit. The Second Circuit presented a clear framework for evaluating conflicts of interest.

> A defendant will have suffered ineffective assistance of counsel in violation of his Sixth Amendment rights if his attorney has a per se conflict, a potential conflict of interest that results in prejudice to the defendant, or an actual conflict of interest that adversely affects the attorney's performance. An actual conflict between a lawyer and his client exists when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action... The finding of an actual conflict is only the first step in determining whether a defendant has established his claim of ineffective assistance of counsel... Once the defendant has established that an actual conflict exists, he need not prove prejudice, but simply that a lapse of representation resulted from the conflict. That is, the defendant must demonstrate that some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.

*Armienti v. U.S,* 313 F.3d 807, 810-11 (2d Cir. 2002) (citations and internal quotations omitted). If Greenman's failure to call Amoia Jr. were to be considered an actual conflict, only the first prong of the test would be satisfied. Petitioner must also "demonstrate that some plausible alternative defense strategy or tactic might have been pursued." *Id.* Since Amoia Jr. would have pled the Fifth Amendment in any case, there is nothing else Greenman could have done. Since no alternative action could have been taken, petitioner's guilty verdict would have been unaffected by any futile attempt to call Amoia Jr. Therefore, petitioner's Sixth Amendment right to effective assistance of counsel was not violated.

Claim Seven

_____No pre-trial identification procedures, either by photograph or in person, had taken place during which Palmer was asked to identify petitioner. (Trial Tr. vol. VI, 941-42.) Greenman informed the trial judge that Palmer had seen his client brought into the

courtroom in handcuffs the very morning Palmer testified at trial. (Trial Tr. vol. VI, 943.) Palmer, though, testified that he had only seen the defendant in the courtroom when he entered it to testify, at about 9:30 a.m. (Trial Tr. vol. VI, 998-99.) Greenman requested that the County Court use "some measures to ensure some trustworthiness with respect to any in-court identification, with respect to a lineup and or other suppression hearings, to determine what taint there may be." (Trial Tr. vol. VI, 938.) The County Court denied Greenman's request and said that if there is a taint that "it can be brought out on cross." (Trial Tr. vol. VI, 943.)

Palmer testified, on direct examination, that after he and Goodman had been at the Pier for no more than an hour, Goodman got into an argument with a man Palmer described as about as tall as Goodman (who is six feet, two inches), stocky in build ("I would say he was a good 230 pounds"). (Trial Tr. vol. VI, 949-50.) He also testified that this argument took place in the bar, where there was light, and that he was about ten feet from Goodman and the other man. (*Id*. at 951.) Palmer testified that he turned to watch the argument, and noticed another man, who had been against the wall, come towards them. (*Id*. at 951.) Palmer described that individual as about five feet, nine inches tall (which was about two inches shorter than Palmer) and stocky in build. (*Id*. at 951.) Palmer identified that man in the courtroom as the defendant. (*Id*. at 951.) Palmer said that he was about six feet from the defendant and the lighting enabled him to see the defendant's face. ( *Id*. at 952.) Palmer said that the defendant said to him, over and over, "do you want some, do you want some." (*Id*. at 952.) Palmer stated that he watched the defendant like this for approximately three or four minutes. (*Id*. at 952.) Security arrived and directed the tall man confronting Goodman, and the defendant, to leave the bar. (*Id*. at 953.) About five minutes

after that, Palmer testified that he and Goodman left the bar. (*Id*. at 954.) They got into

Goodman's car, and as they were pulling out of the parking lot, a white Ford Explorer

blocked their way. (*Id*. at 955.) The three occupants of the Explorer got out of their car, and

Palmer testified that he and Goodman exited their car, too. (*Id*. at 955.) Palmer stated that

the defendant exited from the passenger side of the Explorer, but could not tell whether it

was the front or rear passenger seat. (*Id*. at 956.) Again, Palmer stated, the defendant kept

saying, "do you want some," to him. (*Id*. at 956.) Palmer testified that, during the altercation

in the parking lot, petitioner "was putting his hands down his pants under his t-shirt."*(Id.* at

957.) Palmer also testified that he saw petitioner in the front seat of Amoia Jr.'s explorer.

(*Id*. at 962-63.)

Petitioner claims that the County Court's failure to have conducted a lineup or a

*Wade* hearing for Palmer deprived petitioner of his rights to due process and a fair trial.

(Br. for Appellant at 43.)  In that regard, the Supreme Court, deciding two habeas corpus

petition appeals, discussed the role of the jury specifically in the context of the evaluation

of identification evidence:

> Where identification evidence is at issue, however, no such special
> considerations justify a departure from the presumption that juries will follow
> instructions. It is the reliability of identification evidence that primarily
> determines its admissibility. And the proper evaluation of evidence under the
> instructions of the trial judge is the very task our system must assume juries
> can perform. Indeed, as the cases before us demonstrate, the only duty of
> a jury in cases in which identification evidence has been admitted will often
> be to assess the reliability of that evidence.

*Watkins v. Sowders*, 449 U.S. 341, 347 (1981) (citations and internal quotations omitted).

In *Watkins*, the Supreme Court recognized that the defendant can "both cross-examine the

identification witnesses and argue in summation as to factors causing doubts as to the

accuracy of the identification." *Id.* at 348. The petitioners in *Watkins* argued, just as petitioner does in the instant case, that the presence of the jury limited their ability to vigorously cross-examine the identifying witness. *Id.* at 348. The Supreme Court wrote that the petitioners in *Watkins* relied on a passage from *United States v. Wade*, 388 U.S. 218 (1967):

> "the predicament in which Wade's counsel found himself — realizing that possible unfairness at the lineup may be the sole means of attack upon the unequivocal courtroom identification, and having to probe in the dark in an attempt to discover and reveal unfairness, while bolstering the government witness' courtroom identification by bringing out and dwelling upon his prior identification."

*Watkins*, 449 U.S. at 348 (*quoting Wade*, 388 U.S. at 240-41). The Court responded that,

> [U]nder our adversary system of justice, cross-examination has always been considered a most effective way to ascertain truth. We decline in these cases to hold that the Due Process Clause of the Fourteenth Amendment inevitably requires the abandonment of the time-honored process of cross-examination as the device best suited to determine the trustworthiness of testimonial evidence.

*Id.* at 349. Near the end of its decision, the Supreme Court offered a summation of its discussion in the form of a general principle:

> A judicial determination outside the presence of the jury of the admissibility of identification evidence may often be advisable. In some circumstances, not presented here, such a determination may be constitutionally necessary. But it does not follow that the Constitution requires a *per se* rule compelling such a procedure in every case.

*Watkins*, 449 U.S. at 349.

The County Court did not, therefore, violate petitioners right to due process simply by its refusal to conduct a *Wade* hearing or conduct a lineup. Plaintiff claims that the fact that Palmer saw him alone in the courtroom is potentially tainting, thereby making Palmer's in-court identification of him unreliable. The Court disagrees. The Second Circuit has

stated that it is "a general principle that, while the reliability of eyewitness identification testimony is usually an issue for jury determination, when the degree of unreliability leads to a very substantial likelihood of irreparable misidentification the tainted testimony must be excluded to preserve the defendant's due process rights." *Kennaugh v. Miller* 289 F.3d 36, 43 (2d Cir. 2002) (citations and internal quotations omitted). In evaluating the suggestiveness of Palmer's exposure to the defendant in the courtroom, the issue before the Court is whether it made his identification unreliable, and if so, did "the degree of unreliability lead[] to a very substantial likelihood of irreparable misidentification"? *Id.* "Even an identification at trial under circumstances that are tantamount to a showup is 'not per se inadmissible, but rather depends upon the 'totality of the circumstances.'" *Id.* (*quoting United States v. Archibald*, 734 F.2d 938, 942 (2d Cir. 1994). The Court, thus, looks to the "totality of the circumstances" to decide if "a very substantial likelihood of irreparable misidentification" occurred.

From a review of the testimony, if the Court finds that Palmer had enough contact with petitioner to sufficiently view him. When Palmer first saw petitioner, he was six feet away in a lighted area and nothing blocked Palmer's view of him. (Trial Tr. vol. VI, 952.) Palmer testified that petitioner spoke to Palmer saying, "do you want some?", about six times (*Id.*) After they left the bar, Palmer testified, both groups starting arguing and fighting, for approximately fifteen to twenty minutes, until security made them leave. (Trial Tr. vol. VI, 955-60.) Palmer, therefore, spent ample time viewing and even interacting with petitioner to enable him to clearly identify him. Moreover, Palmer never wavered in his identification of petitioner. The County Court told petitioner that if he had concerns as to possible taint of Palmer's identification that he could address those concerns on cross-

32

examination. Greenman did, in fact, question Palmer regarding possible taint. (Trial Tr. vol. VI, 999-1003.) In the process of this line of questioning, the jury was made fully aware of the basis upon which petitioner supports his claim of possible taint.

However, on cross-examination, Greenman was unable to show that Palmer's identification was tainted by the in-court observation of petitioner prior to testifying. Rather, Palmer's testimony revealed that he had been particularly aware of the petitioner during their confrontations the night of the murder, and had, at that time, ample opportunity to see petitioner. Palmer's testimony established that his identification had an origin independent of his in-court viewing of him and, thus, was sufficient to meet the threshold of reliability needed to permit him to testify. Any further question of reliability was a matter for the jury. Since the County Court was not required to hold a *Wade* hearing and Palmer sufficiently showed that his testimony had an independent origin so as to avoid a very substantial likelihood of irreparable misidentification, the County Court did not violate petitioner's rights to due process.

Claim Eight

As already discussed in point three, above, Runfola invoked his Fifth Amendment privilege. (Trial Tr. vol. VIII, 1288-90.) However, Greenman stated that Runfola made statements to him, off the record, that would have implicated another individual as the shooter. (*Id*. at 1302.)  The County Court ruled that these hearsay statements were inadmissible. However, Greenman argued at trial that Runfola's statements to him were admissible as statements against penal interest. (*Id*. at 1294-96). Greenman also sought a mistrial so that he himself might offer the statements into evidence through his own testimony. (*Id*. at 1307.) The County Court denied Greenman's motion for a mistrial. (*Id*.

33

at 1307-09.) Petitioner now claims that the County Court's failure to grant Greenman's mistrial motion deprived him of his due process rights.

"The hearsay rule, which has long been recognized and respected by virtually every State, is  based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact." *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973). The possible tension between the general inadmissibility of hearsay and the defendant's right to present evidence is avoided in most cases by various exceptions to the hearsay rule that allow parties to offer out-of-court statements bearing some indicia of reliability. The Supreme Court described the acceptable hearsay statements in *Chambers*:

> A number of exceptions have developed over the years to allow admission of hearsay statements made under circumstances that tend to assure reliability and thereby compensate for the absence of the oath and opportunity for cross-examination. Among the most prevalent of these exceptions is the one applicable to declarations against interest — an exception founded on the assumption that a person is unlikely to fabricate a statement against his own interest at the time it is made.

*Chambers*, 410 U.S. at 298-99. State law is similar. The County Court, in denying admission of the hearsay evidence, referenced  *People v. Brown*, 26 N.Y.2d 88, 92 (N.Y. 1970), which states in pertinent part, "a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest."; *see People v. Settles*, 46 N.Y.2d 154, 169 (1978) ("Only when there is other evidence tending to show that the declarant or someone he implicates as his accomplice actually committed a crime, may a declaration against penal interest be said to display the degree of reliability sufficient to overcome the dangers of admitting hearsay evidence.").

Petitioner claims that Runfola's statements were against Runfola's penal interest and that the County Court erred, therefore, in its refusal to admit those statements. The

Court disagrees. As the Appellate Division held on Zanghi's direct appeal,  "[Runfola's] statement concerning the shooting, which was largely exculpatory, was not contrary to the declarant's penal interest…. In addition, there was insufficient evidence of reliability and trustworthiness to warrant admission of the statement into evidence." *Zanghi*, 684 N.Y.S.2d at 807.

Runfola's statements, as proffered by Greenman, do nothing more than put Runfola in the Explorer. (Trial Tr. vol. VIII,1296-1309). Greenman indicated that were he to testify, he would state that Runfola, after the shooting, said to Anderson, "You're a fucking idiot. Was anyone hit?" (*Id*. at 1303.)  Runfola's mere presence in the car from which someone was shot is not itself a crime. For his statements to be considered against his penal interest, Runfola would have needed to implicate himself in some criminal activity. However, Runfola's proffered testimony does not. The rationale for allowing otherwise barred hearsay statements is that "a person is unlikely to fabricate a statement against his own interest at the time it is made." *Chambers*, 410 U.S. at 299. Since these statements in no way implicate Runfola, they do not possess any "persuasive assurances of trustworthiness." *Id.* at 302.

The County Court's decision to deny the hearsay evidence was within its discretion and did not result "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1).

Claim Ten

Petitioner claims that the evidence was insufficient, as a matter of law, to sustain his conviction for reckless endangerment in the first degree of Turpin and Evans. (Br. for Appellant at 59.) In this regard, it is clear "that a defendant challenging the sufficiency of

the evidence bears a very heavy burden." *United States v. Rivalta*, 892 F.2d 223, 227 (2d Cir. 1989); *see United States v. Buck*, 804 F.2d 239 (2d Cir. 1986). The Supreme Court established the standard for evaluating the sufficiency of the evidence to support a criminal conviction. "[V]iewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Francis S. v. Stone*, 221 F.3d 100, 115 (2d Cir. 2000.)

When considering the sufficiency of the evidence of a State conviction, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999). The language of the statute upon which petitioner's conviction is based reads, "A person is guilty of reckless endangerment in the first degree when, under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person." N.Y. Penal Law § 120.25 (McKinney 2004).

Turpin testified at trial that he was in the driver's seat of his car when the white Ford Explorer pulled up, and stated that he heard what sounded like a gunshot at the same time. (Trial Tr. vol. II, 106, 109.) Turpin further testified that after the Explorer stopped, at a position approximately four feet ahead of his car, he "saw a gunman hanging out of the window saying, do you want some, do you want some," and the gunman aimed the gun at him. (*Id*. at 106.) He then identified the gunman as petitioner. (*Id*. at 106-07.) He then heard what sounded like a gunshot, and the rear window of his car shattered. (*Id*. at 109.) The Explorer then drove away. Turpin stated that the entire transaction took approximately

five to ten seconds from the time the Explorer stopped, petitioner spoke to him, shot, and the Explorer drove away. (*Id*. at 110.)

Petitioner argues that although the gunman aimed the gun at Turpin, he then shot the rear window of the Escort, thus, "the gunman did so merely to scare Turpin and then discharged the weapon safely into the Escort's rear door." (Br. for Appellant at 61.) Assuming that petitioner was the shooter, even if he only meant to scare Turpin, all that the statute requires is that the shooter shoots with a depraved indifference to human life. Based on the evidence here, any rational trier of fact could have found this element beyond a reasonable doubt.

Evans testified that he was just outside the car when the Explorer pulled up. (Trial Tr. vol. III, 309-10.) When the Explorer pulled up, Evans testified, petitioner fully extended his arm out of car, holding a gun, at which time Evans ducked behind the Escort. (Trial Tr. vol. III, 315-16.) Evans then testified that a shot was fired, breaking the glass of the rear window. (*Id*. at 316.) Evans said that he thought the gunshot did not sound real, so he stood back up. (*Id*.) Then, Evans testified, petitioner pointed the gun at his head, so Evans ducked again. (*Id*. at 319.) Evans then indicated  that he heard a third shot, followed by the car speeding away. (*Id*.)

In regards to Evans' testimony, petitioner claims "that the shooter only *pointed* the gun in Evan's direction before the second shot discharged, not that the gunman actually aimed it at Evans as he fired." (Br. for Pet'r at 61 (emphasis in original).) Petitioner claims that because there was no evidence that "the gunman ever fired the weapon in Evans' direction so that a grave risk of death was created." (*Id.*) To satisfy the elements of the crime in question, it is not necessary that petitioner have shot directly at Evans, only that

37

petitioner showed depraved indifference to Evans' life. Based on the testimony in the record, a rational trier of fact could reasonably have found petitioner to have possessed this mental state.

Viewing this evidence in the light most favorable to the prosecution, a rational trier of fact could have found that petitioner recklessly engaged in conduct which created a grave risk of death to Turpin and Evans. Petitioner has failed to demonstrate that the State court's finding of sufficient evidence to convict him of reckless endangerment amounted to an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1).

## CONCLUSION AND ORDER

For the reasons stated above, petitioner's petition for habeas relief pursuant to 28 U.S.C. § 2254 is denied, and the action is dismissed.

Further, because the issues raised in the petition are not the type that a court could resolve in a different manner, and because these issues are not debatable among jurists of reason, the Court concludes that the petition presents no federal question of substance worthy of attention from the Court of Appeals and, therefore, pursuant to 28 U.S.C. § 2253 and Rule 22(b) of the Federal Rules of Appellate Procedure, the Court denies a certificate of appealability.

The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person. *Coppedge v. United States*, 369 U.S. 438 (1962). Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests

to proceed on appeal as a poor person must be filed with the United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

SO ORDERED.

Dated:   November 30, 2005
       Rochester, New York_            /s/ Charles J. Siragusa_____
                                       CHARLES J. SIRAGUSA
                                       United States District Judge